**HELENA CHEMICAL CO. and Hyperformer Seed Co., Appellants/Cross–Appellees,**

v.

**Kenneth WILKINS and Tom Wilkins, Individually and d/b/a Chapotal Farms and Porciones 99 Properties; Geen Wilkins and Mark Wilkins, Individually and d/b/a Tabasco and Wilkins Family Limited Partnership, Appellees/Cross–Appellants.**

No. 04–99–00107–CV.

Court of Appeals of Texas, San Antonio.

March 8, 2000.

---

Charles C. Murray, Lisa Powell, Atlas & Hall, L.L.P., McAllen, Keith Parr, Kevin P. McJessy, Chicago, Ill., for appellant.

John Skaggs, Skaggs & Garza, L.L.P., McAllen, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

Helena Chemical Company and Hyperformer Seed Company (collectively "Helena") appeal the trial court's entry of judgment, in which Kenneth, Tom, Geen, and Mark Wilkins, as well as their respective business entities, (collectively "the Wilkins") were awarded $360,000 plus attorney's fees following a jury trial.

Helena raises five issues on appeal. In its fourth issue, Helena asserts that the Wilkins are barred from asserting their claims because of their alleged failure to fulfill the arbitration requirements of the Texas Agriculture Code. In its fifth issue, Helena claims the trial court abused its discretion in admitting testimony by the Wilkins' expert. In its first, third, and second issues, Helena asserts that the evidence is legally and factually insufficient to support the jury's verdict as to causation, liability, and damages. On cross-appeal, the Wilkins claim the trial court erred in its manner of assessing pre-judgment interest.

### BACKGROUND

The Wilkins manage farms in Hidalgo and Starr Counties. Helena sells seed. The Wilkins purchased Cherokee grain sorghum [1] from Helena in 1992, 1993, and 1994. The Wilkins claim to have relied upon Helena's promotional literature, which states that Cherokee has "excellent dryland [ (farmland with little or no irrigation) ] yield potential." [2]

---

1. Sorghum: "any of an economically important genus (*Sorghum*) of Old World tropical grasses similar to Indian corn in habit ... with ... spikelets in pairs on a hairy rachis [ (axial structure) ]; *esp:* a cultivated plant (as a grain sorghum or sorgo). ...." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1126 (1991).

2. The Cherokee seed is also purported to have "good field tolerance" to charcoal rot. When

Although the Wilkins' 1992 Cherokee crop produced a high yield, their 1993 and 1994 Cherokee crops suffered from reduced yields. The parties disagree as to the cause of the reduced yield. The Wilkins claim that the 1993–94 crops "failed to produce or perform as expected, or as represented by [Helena]." They argue that the Cherokee failed because it is not drought resistant or tolerant to charcoal rot.

Helena argues that the Cherokee seed failed because the Wilkins had planted cotton (which reduces soil moisture) a year earlier on a portion of the field, which reduced the Cherokee yield significantly on that part of the field. According to Helena, Cherokee is tolerant to charcoal rot (but is not immune) and grows well in dryland conditions (but not when the underlying soil has been depleted of its moisture in a previous cotton crop).

The Wilkins sued Helena on February 7, 1995, alleging that Helena had violated the Deceptive Trade Practices Act ("DTPA"), breached implied and express warranties, and committed fraud. On February 21, 1995, Helena filed a plea in abatement and motion to compel arbitration of the Wilkins' claims. On April 5, 1995, the trial court abated the proceeding and granted Helena's motion to compel. On August 30, 1996, the Wilkins submitted the matter to arbitration. On October 16, 1996, the Texas Plant and Seed Board declined to arbitrate the matter because the crops were not in "field conditions." The trial court subsequently lifted the abatement.

A jury found for the Wilkins on the different theories of recovery, except on the question of fraud and whether Helena had committed these acts knowingly. The jury awarded damages to the Wilkins in the amount of $360,000. The trial court entered judgment against Helena, awarding prejudgment interest from October 23,

1996 (the day the Seed and Plant Board stated that the Wilkins' claims did not qualify for arbitration). Helena appeals; the Wilkins appeal as to the date from which prejudgment interest is computed.

### Discussion

### 1. Arbitration

In its fourth issue, Helena asserts that the Wilkins are barred from asserting their claims because they failed to comply with the requirements imposed by the Texas Agriculture Code. The Agriculture Code provides, in part:

(a) When a purchaser of seed designed for planting claims to have been damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed under this subtitle or as a result of negligence, *the purchaser must submit the claim to arbitration as provided by this chapter as a prerequisite to the exercise of the purchaser's right to maintain a legal action* against the labeler....

(b) Any period of limitations that applies to the claim *shall be tolled* until the 11th day after the date of filing with the commissioner of the report of arbitration by the board of arbitration.

(c) A claim of damages due to the failure of the seed as described by Subsection (a) of this section *may not be asserted* as a counterclaim or defense in any action brought by a seller against a purchaser *until* the purchaser has submitted a claim to arbitration.

(d) When the court in which an action has been filed by a seller of seed described by Subsection (c) of this section receives from the purchaser

---

grain sorghum develops charcoal rot, the stem becomes weak. It "lodges," or literally "falls down," which reduces yield. The best height for harvesting sorghum with a combine is chest-high, because the harvesting equipment cannot pick it as effectively if it is shorter. Also, if the sorghum is shorter, the combine will pull in other undesirable parts of the plant (called "trash"), as well as dirt and rocks.

a copy of the purchaser's complaint filed in arbitration, accompanied by a written notice of intention to use the claim as a counterclaim or defense in the action, the seller's action shall be stayed. Any period of limitations that applies to the claim is suspended until the 11th day after the date of filing with the commissioner of the report of arbitration by the board of arbitration.

Tex. Agric. Code Ann. § 64.002 (Vernon 1995) (emphasis added). The code requires seed bags to provide a notice alerting the farmer to the requirement of submitting claims to arbitration. *See id.* § 64.003. The seed bag tendered as an exhibit to this court contains such a notice.

The Agriculture Code sets forth the arbitration procedure, in part, as follows:

(a) A purchaser *may begin arbitration* by filing ... a sworn complaint and a filing fee, as provided by department rule. The purchaser shall send a copy of the complaint to the seller by certified mail. Except in the case of seed that has not been planted, the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions.

....

(c) The commissioner shall refer the complaint and the answer to the arbitration board for investigation, findings, and recommendations.

....

(e) The report of the arbitration board shall include findings of fact, conclusions of law, and recommendations as to costs....

(f) In the course of its investigation, the ... board or any of its members may:

(1) examine the purchaser and the seller on all matters that the arbitration board considers relevant;

(2) grow to production a representative sample of the seed through the facilities of the commissioner or a designated university under the commissioner's supervision; or

(3) hold informal hearings....

....

(h) The arbitration board shall consider any field inspection or other data submitted by either party in its report and recommendation....

*Id.* § 64.006 (Vernon Supp.2000). The effect of arbitration is that:

In any litigation involving a complaint that has been the subject of arbitration under this chapter, any party may introduce the report of arbitration as evidence of the facts found in the report, and the court may give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable. The court may also take into account any findings of the board of arbitration with respect to the failure of any party to cooperate in the arbitration proceedings, including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.

*Id.* § 64.004 (Vernon 1995). We did not locate any Texas case law reviewing these sections of the Agriculture Code as they relate to this case. If the Wilkins' claims are barred, then the trial court did not have subject matter jurisdiction to hear the case.

### a. *Standard of Review*

 The question of whether a trial court has subject matter jurisdiction is a question of law subject to de novo review. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). We construe the petition in favor of the Wilkins and, if necessary, review the entire record to determine if any evidence supports the district court's jurisdiction to hear the cause. *See Texas Ass'n of Bus. v. Texas Air Control Board,* 852 S.W.2d 440, 446 (Tex. 1993). Unless the pleadings demonstrate the absence of jurisdiction, we assume the trial court properly had jurisdiction over

the case. *See Peek v. Equipment Serv. Co.*, 779 S.W.2d 802, 804 (Tex.1989).

### b. Construction of Texas Agriculture Code

■ The purpose of statutory construction is to ascertain legislative intent. *See Woods v. Littleton*, 554 S.W.2d 662, 665 (Tex.1977). Where the intent is clear, it will be given effect, even if the result appears to be harsh. *See Boudreaux v. Texas and N.O.R. Co.*, 78 S.W.2d 641, 644 (Tex.Civ.App.-Beaumont 1935, writ ref'd). In ascertaining this intent, the Legislature has provided that words and phrases shall be read in context and construed according the rules of grammar and common usage. *See* TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 1998). A court may consider, among other things, the object sought to be obtained and the consequences of any particular construction. *See id.* § 311.023; *Cole v. Texas Employment Comm'n*, 563 S.W.2d 363, 367 (Tex.Civ.App.-Fort Worth 1978, writ dism'd).

#### (1) FRAMING THE ISSUE PROPERLY

■ Public policy favors agreements to resolve legal disputes through agreements to arbitrate. *See EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex.1996); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex.1992). "Questions of arbitability must be addressed with a healthy regard for the federal policy favoring arbitration...." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The parties must arbitrate any claims that fall within the scope of the arbitration agreements, even though piecemeal litigation might result. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220–21, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). If the Wilkins had not submitted a claim to arbitration *at all*, their claim would be barred. The legislature has stated very clearly that "the purchaser must submit the claim to arbitration as provided by this chapter as a prerequisite to the exercise of the purchaser's right to maintain a legal action."

TEX. AGRIC. CODE ANN. § 64.002 (Vernon 1995).

The code states that "the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions." *See id.* § 64.006 (Vernon Supp.2000). Here, the Wilkins did not submit the claim to arbitration until well after the time that they began to notice Cherokee's poor performance. As a result, the issue before us is whether this *delay* in submitting the claim to arbitration acts as a catastrophic bar to the Wilkins' legal claim.

#### (2) SEED ARBITRATION IS NON-BINDING

The arbitration scheme for seed claims recognizes that "farmers and seedmen agree that litigation is not the most desirable way to settle a complaint about seed." Op. Tex. Att'y Gen. No. DM–3 (1991). The arbitration process for seed, although a potential avenue for settlement without trial, also "provides for an unbiased third party *investigation*." *Id.* (emphasis added) (citation omitted). Recognizing the benefits of mandatory non-binding arbitration, the American Seed Trade Association has worked with state legislators to enact statutes to aid in the investigation and resolution of seed claims. *See, e.g.,* AMERICAN SEED TRADE ASS'N, *Legislative Affairs* (visited February 1, 2000) <http://www.amseed.com/ann-rept/ar98/ar98p7.html>; AMERICAN SEED TRADE ASS'N, *Legislative Affairs* (visited February 1, 2000) <http://www.am-seed.com/annrept/legis.html>.

In furtherance of the non-binding seed arbitration process, the statute requires only that the arbitration board produce a report containing "findings of fact, conclusions of law, and recommendations as to costs." TEX. AGRIC. CODE ANN. § 64.006 (Vernon 1995). Neither party is required to introduce the report of arbitration into evidence. *Id.* § 64.004. The court has discretion to "give such weight to the arbitration board's [report] as [it] determines advisable." *Id.* Even if the language in the

first sentence of Section 64.004 ("has been the subject of arbitration") is read to require actual *arbitration* of the claim (as opposed to *submission* of the claim to arbitration), the second sentence explains what the court may do, *regardless* of whether the claim was submitted to arbitration. *See id.* The court is empowered to consider the parties' failure to cooperate, "including any finding as to the *effect* of delay in filing the arbitration claim or the *arbitration board's ability to determine the facts of the case." Id.* (emphasis added). The arbitration contemplated by our legislature is not intended to replace the parties' right to have their day in court. In fact, the legislature expressly accounted for the possibility that a party might be delayed (or purposely delay) filing a claim for arbitration.

(3) THE STATUTE PROVIDES A REMEDY FOR FAILING TO FILE A CLAIM IN A TIMELY FASHION

■ A strict reading of the Texas Agriculture Code might lead one to believe that a farmer's failure to submit a claim to arbitration while the crop is in "field conditions" has the extreme effect of barring the claim altogether. Yet, the plain language of the statute reveals that there is a fundamental difference between failing to submit the claim in a timely fashion in comparison to failing to submit a claim at all. If a party fails to submit a claim to arbitration in a timely fashion, the trial court may take remedial action in light of the circumstances of the delay or the conduct of the parties. If a party fails to submit a claim to arbitration altogether, the party may not maintain legal action.

(4) THE PARTIES' ACTIONS

■ In the present case, conflicting testimony exists as to who was responsible for prolonging the investigation and negotiation before the suit was commenced. The parties do not dispute that the claim was not submitted to arbitration until approximately sixteen months after the trial court granted Helena's motion to compel arbitration. The parties instead differ as

to who bears the responsibility for causing for the delay. In the end, the State Seed and Plant Board refused to arbitrate the matter because they were unable to examine the crops in "field conditions." We note that the parties were apparently attempting to effectuate a non-trial resolution of the Wilkins' claims. We note also that Helena could have moved to dismiss the suit at any time after the trial court agreed to compel arbitration, rather than wait until the board issued its findings. Such a motion, if made before the Wilkins eventually sought arbitration, would have been very compelling because the Wilkins had not fulfilled the necessary conditions to maintaining their legal action.

In the present case, Helena waited until *after* the Board determined "that the request did not qualify for arbitration" (on October 16, 1996) before it moved to dismiss the Wilkins' lawsuit (on November 16, 1996). A positive outcome of the delay is that the parties were continuing to attempt resolution of the claim without the consequences of litigation. An unfortunate result of the delay is that the arbitrators could not investigate the crops under "field conditions." Helena could not, therefore, have a neutral expert investigate the efficacy of its seed. Helena was not, however, without remedy. The trial court could have considered all of the circumstances surrounding the delay in adjudicating the case.

We find that an arbitration board's inability to investigate crops in "field conditions" does not bar the plaintiff's claim in a case that falls under Chapter 64 of the Texas Agriculture Code. The defendant has adequate remedies that could have been pursued after the trial court ordered arbitration. In addition, the trial court has the necessary tools to fashion a remedy itself during trial if necessary. We choose to exercise restraint here. We do not wish to make law where our legislature has already spoken. The trial court was empowered to take such delay into account under Section 64.004 of the Agriculture

Code. Because the Wilkins submitted their claim to arbitration, we conclude that their claim is not barred.[3] The trial court had jurisdiction to hear the case.

## 2. Expert Testimony

In its fifth issue, Helena argues that the trial court abused its discretion in admitting the testimony of Wilkins' expert, Dr. Pleunneke ("Pleunneke"). His opinion was that Cherokee seed is not an appropriate grain sorghum for dry land crops where the Wilkins' farm is located (Starr County).[4] Helena argues that Pleunneke is unqualified to testify as an expert and that his testimony as an expert is unreliable. Helena does not complain that his testimony amounts to an unreliable scientific opinion.

### a. Standard of Review

 Whether the trial court properly admitted Dr. Pleunneke's testimony is subject to an abuse of discretion standard of review. See E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549, 558 (Tex.1995); Wal–Mart Stores, Inc. v. Garcia, 974 S.W.2d 83, 86 (Tex.App.-San Antonio 1998, no pet.). We examine the entire substance of the expert's testimony "to determine if the opinion is based on demonstrable facts and does not rely solely on assumptions, possibility, speculation, and surmise." Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 712–13 (Tex. 1997). The decision to admit evidence is in the discretion of the trial court. See Robinson, 923 S.W.2d at 558 (citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex.1985)); Ginsberg v. Fifth Court of Appeals, 686 S.W.2d 105, 108 (Tex.1985). We have stated that an abuse of discretion exists when the court fails to analyze or apply the law correctly. Muecke v. Hallstead, No. 04–97–00483–CV, 2000 WL 328129, at *2 (Tex.App.-San Antonio March 29, 2000, no pet. h.).

### b. Admissibility

 Texas Rule of Evidence 702 permits a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise" if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX.R. EVID. 702. Such testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other factors. TEX.R. EVID. 403. There exists no bright-line test to guide us as to whether a particular witness is qualified to testify as an expert. See James v. Hudgins, 876 S.W.2d 418, 421 (Tex.App.-El Paso 1994, writ denied)

---

3. Our resolution of Helena's issue regarding the Wilkins' failure to arbitrate in a timely fashion is consistent with a Texas case discussed during oral argument. In Hines v. Hash, the Supreme Court of Texas affirmed the judgment of the trial court in a DTPA case Hines failed to give Hash the statutory notice of an impending DTPA claim prior to commencing suit. See Hines v. Hash, 843 S.W.2d 464, 469 (Tex.1992) (concluding "that if a plaintiff files an action for damages under the DTPA without first giving the required notice, and a defendant timely requests an abatement, the trial court must abate the proceedings"). The court explained that the court of appeals erred in reversing and remanding the case because Hash "waived notice under the DTPA by failing to request abatement." Id. Our result today is not at odds with Hines because we recognize that filing a claim for arbitration is necessary in order to maintain a legal action. When an untimely claim for arbitration is filed, the Agriculture Code provides the trial court with ample room to fashion a remedy.

4. "Dry land" refers to non-irrigated land that relies upon natural precipitation for moisture. The viability of a dry land parcel is relative to the amount of rainfall it receives. Whether a seed is suitable for dry land farming depends upon various factors; for example, its ability to tolerate diseases such as charcoal rot determines whether a seed is suitable for dry land farming. A drought-stressed crop is more likely to develop charcoal rot. So, if a dry land crop does not tolerate charcoal rot well, and if below-average rainfall occurs (assuming no irrigation), such a crop is at an increased risk of developing charcoal rot. As discussed earlier, a crop of grain that has a greater chance of developing charcoal rot could result in decreased yields.

(noting that the absence of "definite guidelines for making the determination of whether a witness's education, experience, skill, or training qualify the witness as an expert"). We focus instead on whether the expert's expertise "goes to the very matter on which he or she is to give an opinion." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex.1996).

### c. Did the Trial Court Err in Admitting Dr. Pleunneke's Expert Testimony?

(1) QUALIFICATIONS

■ Helena argues that Pleunneke is unqualified to render an opinion regarding Cherokee's ability to tolerate charcoal rot. Helena also claims that because Pleunneke is not a plant pathologist, he is unqualified to render an opinion on diseases affecting plants.

At trial, the Wilkins had the "burden to show that [Pleunneke] possess[es] special knowledge as to the very matter on which he" testified. *Broders*, 924 S.W.2d at 152–53; *Negrini v. State*, 853 S.W.2d 128, 130–31 (Tex.App.-Corpus Christi 1993). The central issue regarding Pleunneke's qualifications is *not* whether he is qualified to render an opinion with respect to Cherokee's inherent susceptibility to charcoal rot. *Instead*, the issue regarding his qualifications is whether he is qualified to render an opinion regarding Cherokee's suitability for dry land farming. In determining Pleunneke's qualification to provide such an opinion an important factor to consider is his ability to conduct research, gather information, and assimilate the data in a meaningful manner relating to a plant's performance. Is he *able* to marshal the necessary observations in support of his conclusion?

Helena argues that Pleunneke's ability to testify as an expert is limited to those areas within his experience and training. *See* TEX.R. EVID. 702. Pleunneke is a plant scientist and an agronomist. He does not have to be a pathologist (one who studies plant disease). His occupational status does not undermine his ability to testify as an expert in this case. *See Nunley v.*

*Kloehn*, 888 F.Supp. 1483, 1488 (E.D.Wis. 1995) (stating that "[t]he focus ... is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on ... the expert's title"); *Broders*, 924 S.W.2d at 153 (cautioning that "[o]ur holding does not mean that *only* a neurosurgeon can testify about the cause in fact of death from an injury to the brain") (emphasis added); *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (indicating that a physician who serves as an expert witness need not be a specialist in a particular branch of the profession on which the physician offers testimony). Pleunneke has had experience, "on occasion" with charcoal rot in grain sorghum.

Agronomy is the "science of soil management and crop production." THE CONCISE OXFORD DICTIONARY 19 (7th ed.1988). The Wilkins offered evidence that Pleunneke has experience addressing issues regarding plant physiology, nutrition, and environmental factors that affect plant growth.

Although Pleunneke is not a plant pathologist, the trial court's decision to allow him to testify is not an abuse of discretion. The trial judge could have reasonably concluded that Pleunneke's background qualifies him to testify as to the viability of Cherokee seed in the harsh Starr County environment. Although susceptibility to charcoal rot, a plant disease, is the claimed Achilles' Heel of Cherokee, Pleunneke need not necessarily be a pathologist to testify to that effect. He used his experience to formulate a conclusion on the basis of research, study of independent tests, and observations regarding Cherokee's suitability for dry land farming. How disease affects plants is undoubtedly an important part of plant science and the ability to manage crop production effectively. We have permitted, for example, an orthopedic surgeon to give expert testimony regarding a radiologist's interpretation of x-rays and the radiologist's subsequent actions. *See Silvas v. Ghiatas*, 954 S.W.2d

50, 53–54 (Tex.App.-San Antonio 1997, pet. denied) (stating that "[t]heir professions are interrelated and their specialties intertwined").

The trial court had the opportunity to consider whether Pleunneke was qualified to render expert testimony. We find that Helena's voir dire and cross-examination of Pleunneke could all have been factors that the jury considered as to the *weight* of his testimony. We conclude that because his qualifications match the area in which he offered testimony, the trial court did not abuse its discretion in allowing Pleunneke to testify as an expert.

(2) RELIABILITY

 Helena also argues that Pleunneke's testimony is unreliable. Helena does not argue that Pleunneke's testimony is *scientifically* unreliable, which would subject it to an analysis of the elements articulated in *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex.1995). Yet, the testimony must still comport with the principle of reliability articulated in *Robinson*. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998). Even though the subject matter of Pleunneke's testimony is scientific in nature, a *Robinson* inquiry is not necessarily appropriate. *See id.* at 727. Following the lead of *Gammill*, the inquiry becomes whether an "analytical gap" exists; do Pleunneke's observations support his conclusions? *See id.* at 727.

Pleunneke explained that Cherokee seed performs (that is, has good characteristics of growth and a favorable yield) very well when there is adequate rainfall. In non-irrigated trials where precipitation was infrequent, Cherokee did not perform (consistently) as well as other seed manufactured by Helena. This observation, by itself, would suggest that Cherokee is not suited to dry land farming because there is no expectation of consistent precipitation in a dry land farming environment.

Yet, Pleunneke agreed with the statement that certain "tests aren't really something that tells us very much about what might happen in Starr County." He testified, "They're generated statistics and should be taken with a grain of salt." He acknowledged that a range of performance exists for Cherokee, and that "[w]ith *that kind of variability* . . . comparing them all . . . ," Pleunneke would have done more than rely on the tests. (emphasis added). He recommended inquiring of the local farmers "to see what varieties have been working for them on large acreages."

Because our inquiry is whether Pleunneke's observations support his conclusions, we find the testimony to be reliable. His observations include not only the trials in question, but encompass research into other sources (weather and weed control reports, disease publications, and testing). Pleunneke also based his testimony on comparisons with crops adjacent to the Wilkins' farm.

Based on Pleunneke's testimony and his supporting evidence, his opinion as an expert is reliable. Although Helena asserts that his discounting of the trials are fatal to his reliability, we understand his statement to be that there are *factors to consider other than merely the trials*. Because his conclusion flows from his observation of these other factors, as well as the trials, we conclude that the trial court did not err in admitting his testimony.

### 3. Sufficiency of Evidence (First, Second, & Third Issues)

Helena complains that the Wilkins' evidence is legally and factually insufficient to support the jury verdict as to causation, liability, and damages.

### a. Standard of Review

In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *See Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). If more than a scintilla of evidence is offered on a fact, the court should overrule the issue. *See Kindred v.*

*Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). In reviewing a "great weight" or factual insufficiency point, the court should assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). "Under this analysis, we are not fact finders, we do not pass upon the credibility of witnesses, nor do we substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported." *Thrift v. Hubbard*, 974 S.W.2d 70, 76 (Tex.App.-San Antonio 1998, pet. denied).

### b. Causation and Liability (First and Third Issues)

The court submitted the following questions to the jury; the jury answered "yes" to each:

1. Did the defendant engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to the plaintiffs? ["False, misleading, or deceptive act or practice" defined.]

2. Did the defendant engage in any unconscionable action or course of action that was a producing cause of any damages to the plaintiffs? ["Unconscionable action or course of action" explained.]

3. Was the failure, if any, of the defendant to comply with a warranty a producing cause of damages to the plaintiffs? ["Failure to comply with a warranty" defined.]

The jury answered "no" to the fourth question, which addressed fraud. Questions 5–8 concern damages and attorney's fees. An affirmative answer to any of the first three questions would have been sufficient to allow the jury to award damages.[5]

5. The court defined "producing cause" as an "efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any."

(1) Evidence Sufficient to Support Causation? (Jury Questions 1–3)[6]

■ The issue is whether legally and factually sufficient evidence exists to support the proposition that Helena's failure to comply with a warranty, or Helena's deceptive act or unconscionable action, was a producing cause of the Wilkins' damages. Because the trial court did not err in admitting Dr. Pleunneke's expert testimony (discussed earlier), sufficient evidence exists in support of the jury's verdict as to causation.

In addition to Pleunneke's testimony, the various field trials that were performed across Texas also support the possibility that Helena knew that its seed may not be suited for dryland farming. Although some of these trials were discussed during the testimony of Pleunneke, others were referenced during the testimony of Helena's corporate representative. Ample evidence exists regarding *the actual representations* that Helena made regarding the seed (promotional literature and statements by sales representatives, for example). When evidence of Cherokee's lackluster dryland performance is included, these representations amount to *mis*-representations.

### (A) Failure to Explain Other Causes

■ Helena asserts that the Wilkins' prior cotton crop is the cause of the poor yield. Helena also argues that one of the possible reasons for the Wilkins' poor yield is related to over planting in 1993. The Texas Supreme Court has stated that "if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence *excluding* those causes with reasonable certainty." *Merrell Dow Pharm. v. Havner*, 953 S.W.2d 706, 720 (Tex.1997) (emphasis added); *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559 (Tex.1995)

6. Because Helena's complaint regarding liability and causation stem from the same jury questions, we combine our discussion on these issues.

(regarding as speculation an expert who failed to rule out other causes of the damage); *Parker v. Employers Mut. Liab. Ins. Co.*, 440 S.W.2d 43, 47 (Tex.1969) (requiring other reasonable causal explanations to be excluded in order for a possible cause to be elevated to the status of "probable"). The Wilkins explained that the cotton-grain rotation is required by the local crop-management office; his neighbor rotated cotton and grain on certain portions of his acreage without adverse effects; and the alleged "over planting" occurred because the Wilkins followed the recommendations of Helena in planting their 1993 crop.

Here, the jury could have considered the explanations that the Wilkins offered to rebut the possibility of other causes. In light of these explanations, we do not believe that the verdict is against the great weight and preponderance of the evidence so as to be manifestly unjust.

### (B) NON-ACTIONABLE PUFFING

■ Helena also contends that its actions are non-actionable puffing. If the statements in question *lack* "the specificity of an affirmation of fact upon which a warranty could be predicated," then they may amount to puffing, and would not be actionable. *Id.* In the present case, Helena made multiple oral representations to Wilkins regarding Cherokee's suitability for dry land farming on his acreage. More importantly, Helena made written representations in its seed catalogue that indicated Cherokee's suitability for dryland farming was *better* than the other seed brands it sold. Not every seed brand was purported to have "excellent" dryland yield potential. Helena's statements regarding the tolerance level of Cherokee to charcoal rot do not amount to imprecise or vague opinions. Instead, they are used for comparison purposes with other Helena brands, and were made on multiple occasions both orally as well as in writing. *Cf. Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 463 (Tex.App.-Dallas 1990), *writ denied per curiam,* 800 S.W.2d 853 (Tex.1991).

■ The knowledge enjoyed by the buyer and seller is important in determining whether statements amount to puffing. The "decisive test ... is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." *Id.* (citing *Royal Bus. Machs., Inc. v. Lorraine Corp.*, 633 F.2d 34, 42 (7th Cir. 1980)). Although the Wilkins should be expected to exercise their judgment as to which seed to plant, Helena had "special knowledge" in light of their seed's performance in previous trials.

We conclude that the statements do not amount to mere puffing because of their specificity and the disparate positions of knowledge enjoyed by the buyer and seller.

### (C) ACCURACY OF STATEMENTS

Helena argues that the weight of the evidence supports the accuracy of the statements relied upon by the Wilkins; the brochure language is qualified by the statement that the characteristics of the different seed are "averages" and "can vary depending upon location, date of planting, environmental conditions, [and] soil type." Although Wilkins does not respond to this point, Helena does not point to other statements allegedly relied upon the Wilkins (such as oral representations and recommendations made by Helena's representatives). Even if the brochure does not amount to a misrepresentation, other evidence of misrepresentations exists in the record (testimony by Wilkins and Helena sales representative) that is factually sufficient to support the jury verdict.

### (2) INSUFFICIENT EVIDENCE OF UNCONSCIONABILITY (JURY QUESTION 2)

■ Helena asserts, without extensive briefing, that no evidence exists to support the jury's verdict regarding unconscionability. Because we have concluded that

Helena's actions did not amount to mere puffing, at least a scintilla of evidence exists (in the form of Wilkins' testimony) that would support the verdict that Helena took "advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." Because Helena does not complain that the evidence is factually insufficient as to unconscionability, we need not consider whether more than a scintilla of evidence exists on this point. Even if it did not, the verdict would still be upheld as to the first question in the jury charge.

Helena argues that because it did not require payment for the seed in 1994, then there is no consideration paid in order to give rise to an unconscionability claim. Even if this is true, the damages awarded could be supported by the result the jury reached as to the first question.

(3) RELEVANT WARRANTIES WERE EXCLUDED (JURY QUESTION 3)

 Helena argues that liability cannot be based on a breach of warranty because "relevant warranties were excluded." Although a seed company may exclude implied warranties by course of dealing and trade usage, we did. not locate any evidence to this effect in the record. Helena also argues that it excluded the warranties by written document (here, on the seed bag, purchase ticket, and invoices). The purchase agreement (unsigned by the Wilkins) that is in the record provides "conditions of sale" that exclude the implied warranties of merchantability and fitness for a particular purpose in what is relatively conspicuous print. The Wilkins respond that "it would 'be difficult' to replace such a large volume of seed" at the stage when the seed is delivered.

The Uniform Commercial Code adopted in Texas permits a merchant to exclude or limit warranties on goods. *See* TEX. BUS. & COM.CODE ANN. § 2.316 (Vernon 1994).

We have previously applied a non-warranty clause in favor of a seed company. *See Asgrow Seed Co. v. J.R. Gulick*, 420 S.W.2d 438 (Tex.Civ.App.-San Antonio

1967, writ ref'd n.r.e.). In *Asgrow*, this court reversed a trial court's judgment in favor of a purchaser of seed; the sales contract, seed bags, and invoices all contained a non-warranty clause that provided, in part, "Asgrow gives no other or further warranty, express or implied." *Id.* at 440 n. 1, 444; *see also John Deere Co. v. Tenberg*, 445 S.W.2d 40, 42–43 (Tex.Civ. App.-Beaumont 1969, no writ) (stating that the appellee "cannot rely upon breach of implied warranties because implied warranties were excluded in the written instrument" that the appellee signed and accepted).

We find that the warranty language effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose, as well as express warranties. We conclude that a warranty upon which liability can be based does not appear to exist in support of jury question number 3. Recovery under the first and second jury questions is still possible.

*c. Damages (Second Issue)*

We have found no error in the trial court's entry of judgment as to arbitration (fourth issue) or in the admission of expert testimony (fifth issue). We also have found that the evidence is legally and factually sufficient to support the jury verdict as to causation (Helena's first issue, relating to jury questions one and two). We now turn to the matter of damages. In its second issue, Helena argues that the Wilkins failed to prove the amount of their damages with reasonable certainty and the Wilkins' prior losses do not support lost profit damages. Helena also contends that damages should have been limited to the purchase price of the seed.

(1) LIMITATION TO PURCHASE PRICE OF SEED

 Helena's limitation of liability to the purchase price of the seed is effective only to damages arising from the breach of warranty. *See Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 577 (Tex. 1991). A contractual limitation on dam-

ages is not effective to statutorily created rights, such as a right to recover for deceptive acts. *See id.* at 576. Because we have concluded that the judgment should be affirmed as to the first and second jury questions, we address the argument regarding sufficiency of the evidence relating to damages.

**(2)** REASONABLE CERTAINTY REGARDING DAMAGES

■ Helena argues that because the Wilkins have a history of net losses from 1993–96 [7] (which include years when they did not farm with Cherokee), they have failed to establish a history of profits. *See Texas Instruments, Inc. v. Teletron Energy Management,* 877 S.W.2d 276, 278–80 (Tex.1994). The *Teletron* court reiterated the rule established in *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938):

> In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. *Where the business is shown to have been already established and making a profit at the time* when the contract was breached or the tort committed, *such pre-existing profit, together with other facts* and circumstances, *may indicate with reasonable certainty the amount of profits lost.*

*Id.* at 279 (citation omitted) (emphasis added). Yet, at least one court of appeals has held that "the absence of a history of profits does not, by itself, preclude a new business from recovering lost future profits." *Orchid Software, Inc. v. Prentice-Hall, Inc.,* 804 S.W.2d 208, 211 (Tex.App.-Austin 1991, writ denied). The Fifth Circuit has recognized this trend in Texas law. *See Hiller v. Manufacturers Prod. Research Group of N. Am., Inc.,* 59 F.3d 1514, 1519, 1521 (5th Cir.1995) (declining to regard "the absence of a profit history ... as dispositive of the recoverability of lost profits" with respect to a new business). Because *history of loss does not*

preclude a judgment for future lost profits, the issue becomes whether the Wilkins proved their damages properly and with certainty.

■ "[P]recise calculation of anticipated profits *has never been essential* to recovery by any business. It is sufficient if there is data from which the loss may be ascertained with reasonable certainty." *Id.* (emphasis added) (citations omitted). In the present case, evidence exists from which the jury could have determined damages. Helena responds that the factors given to the jury, such as the possible yield of the crops, were speculative in nature, thus making an objective determination of the damages impossible.

Helena also argues that the Wilkins failed to account for net profits. "The general rule for assessing damages for crop losses, as expressed in a number of Texas precedents, is 'the market value of the lost portion of his crop, as measured at maturity of the crop, less the cost he would have had in harvesting and marketing the lost portion.'" *See International Harvester Co. v. Kesey,* 507 S.W.2d 195, 197 (Tex. 1974). Another court has stated, "The correct measure of damages for loss of profits is net profits, which is defined as 'what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business.'" *See St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.,* 917 S.W.2d 29, 60 (Tex.App.-Amarillo 1995), *aff'd in part, reversed in part on other grounds,* 974 S.W.2d 51 (Tex.1998). "In the calculation of net profits, allowance should be made for expenditures which the plaintiff would have been compelled to make...." *Id.*

Wilkins testified as to the method he used to arrive at the damage calculation. For example, he relied upon measurements by a government agency in order to determine

> acreages to come up with deficits.... I took the yield per farm from the [gov-

---

**7.** The Wilkins had a profit of approximately $111,000 in 1992.

ernment agency] and multiplied it times the number of acres of grain that was planted per farm to come up with the number I have under yield.... I took the actual yield based on the sales records of what we produced and subtracted that from what yield should have been ... [t]o come up with a deficit, and then I multiplied the deficit times the number of acres, and then I multiplied that times the price.

Wilkins admitted that he did not include expenses in computing his estimated losses, such as additional lease payments, grain elevator costs, and transportation charges. These expenses would have been higher if the Wilkins enjoyed a greater yield during the years in question. Yet, the record reflects (both in the form of testimony as well as exhibits) what the lease payments would have been. Wilkins testified also that "check-off that the grain elevator deducts" could have been refunded, which explains why he did not add that potential cost to the damages sought. He testified that he believed the costs for drying the grain "were reflected as a shrinking in yield" rather than as an actual charge. A copy of the statement in which Helena canceled the Wilkins' debt for seed in 1994 was admitted as an exhibit as well. Finally, Wilkins testified to the amount of acreage devoted to seed *other than* Cherokee. With this evidence, the jury could have reduced the yield attributable to non-Cherokee seed in arriving at their damage award, recalculated the lease payments, and regarded the various elevator costs as either reflected in the yield or refundable (and not part of the net cost calculation).

The Wilkins' estimated damages (which they submitted to the jury) was $490,-855.58. The jury's award of $360,000 is $130,855.58 lower than what the Wilkins sought. The Wilkins *did not fail* to provide the necessary factual data to support their claim of lost net profits with *reasonable certainty*. Calculating the lost profits in consideration of all of the relevant factors is not impossible, particularly in light of the $130,855.58 deduction that the jury made to the Wilkins' requested damages.

We find that the award is within the range of evidence offered by the Wilkins. We conclude that the damages awarded are supported with reasonable certainty.

### 4. Pre–Judgment Interest (Wilkins' Issue on Cross–Appeal)

On cross-appeal, the Wilkins argue that the trial court erred when it computed prejudgment interest from the date the court lifted the abatement (October 23, 1996). The Wilkins claim that the trial court's judgment should order pre-judgment interest to accrue from November 17, 1994 (which reflects six months after the date of the alleged "occurrence," May 20, 1994).

#### a. Preservation of Error

Helena maintains that because the Wilkins argue a theory of recovery regarding prejudgment interest on appeal that is different from that argued below, they have not preserved error regarding this issue. In their proposed judgment, attached to their Motion for Entry of Judgment, "[p]re-judgment interest is calculated to commence 180 days [after the Wilkins notified Helena of the Wilkins' problem with the seed]." In their Motion to Modify, Correct or Reform Judgment, the Wilkins ask for an award of pre-judgment interest "pursuant to the terms of Article 5069–1.05(6)," which the Texas Legislature repealed in 1997 and replaced with Section 304.108 of the Finance Code. *See* TEX. FIN. CODE ANN. § 304.108 (Vernon 1998 & Supp.2000). On appeal, the Wilkins argue for an award of pre-judgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). In their brief, the Wilkins appear to concede that their reliance on the predecessor to Chapter 34 of the Finance Code, Article 5069–1.05(6), "was inappropriate."

The Wilkins may have waived their right to complain on appeal regarding prejudgment interest because they state a different ground for the relief sought. *See* TEX. R.APP. P. 33.1(a)(1)(A). Assuming, without

deciding, that the issue is preserved for our review, we conclude that the trial court's decision to award prejudgment interest beginning on October 23, 1996 is not an abuse of discretion.

### b. Standard of Review

The award of prejudgment interest during periods of delay is generally left to the discretion of the trial court. *See Lege v. Jones,* 919 S.W.2d 870, 875–76 (Tex.App.-Houston [14th Dist.] 1996, no writ). The trial court's decision in refusing to offset from its interest calculations periods of delay caused by a litigant are reviewed under the abuse of discretion standard. A trial court abuses its discretion if its action "is arbitrary, unreasonable, and without reference to [any] guiding [rules and] principles." *Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997); W. Wendell Hall, *Standards of Review in Texas,* 29 St. Mary's L.J. 351, 362 (1998). Because the offset is discretionary rather than mandatory, we do not substitute our opinion for that of the trial court. *See City of Alamo v. Casas,* 960 S.W.2d 240, 260 (Tex.App.-Corpus Christi 1997, pet. denied).

### c. Discussion

In *Cavnar,* the Texas Supreme Court held that, "as a matter of law, a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment." *Cavnar v. Quality Control Parking,* 696 S.W.2d 549, 554 (Tex.1985). The court later abrogated the *Cavnar* holding and explained that the "[w]hen the Court decided *Cavnar,* there was no statute governing prejudgment interest." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy,* 962 S.W.2d 507, 530 (Tex.1998). In *Johnson,* the court adopted the statutory predecessor to the Texas Finance Code and held that "prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Id.* at 531; *see* Tex. Fin.Code Ann. § 304.104 (Vernon Supp.

2000) (providing similar provisions). The court recognized that the statutory approach to prejudgment interest " 'works as a system of rewards and penalties' intended to encourage settlements." *Johnson,* 962 S.W.2d at 530–31 (citation omitted).

Accrual of prejudgment interest is not automatic. For example, "a court may order that prejudgment interest does not accrue during periods of delay in the trial." *Id.* § 304.108(a). "A court shall consider: (1) periods of delay caused by a defendant; and (2) periods of delay caused by a claimant." Tex. Fin.Code Ann. § 304.108(b) (Vernon Supp.2000). *Johnson* recognizes that this provision, among others, helps encourage settlements. *See Johnson,* 962 S.W.2d at 529 (discussing the predecessor to § 304.108). Yet, "[t]he statute does not mandate such offsetting, which is entirely within the discretion of the trial court." *Casas,* 960 S.W.2d at 260.

The record reflects the Wilkins' understanding of Texas law regarding the necessity of arbitrating seed claims. The Wilkins waited sixteen months after the trial court abated the matter before submitting their claim to arbitration. Conversely, the Wilkins argue that they did not cause any delay. They argue that any delay stems from Helena's desire to continue negotiations.

Given the parties' actions, the trial court could have reasonably commenced prejudgment interest after it lifted the abatement. It could have considered the role that each party played in giving rise to the pretrial delay and concluded that the Wilkins had the most discretion in determining when to submit the claim for arbitration.

### CONCLUSION

We affirm the trial court's judgment.

Dissenting opinion by: SARAH B. DUNCAN, Justice.

SARAH B. DUNCAN, Justice, dissenting.

I respectfully dissent.

### FAILURE TO PERFORM AS REPRESENTED ON WARRANTY OR LABEL

The majority holds the Wilkins' claims are not barred because they "submitted their claim to arbitration," and "[t]he trial court was empowered to take such delay into account under Section 64.004 of the Agriculture Code." *Helena Chem. Co. v. Wilkins,* 18 S.W.3d 744, 751-52 (Tex. App.—San Antonio 2000, no pet. h.). However, it is undisputed the Wilkins did not request arbitration until approximately sixteen months after the suit was abated for that purpose and, as a result, their claims that they were "damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed"[1] were not arbitrated; rather, the arbitration board determined the Wilkins' "request did not qualify for arbitration." Accordingly, section 64.004 does not apply. *See* TEX. AGRIC. CODE ANN. § 64.004 (Vernon 1995) ("In any litigation involving a complaint *that has been the subject of arbitration under this chapter,* ... [t]he court may also take into account ... any finding as to the effect of delay in filing the arbitration claim ....") (emphasis added). Therefore, even if we view "must" in section 64.002 of the Texas Agriculture Code as directory rather than mandatory, and even if the Wilkins' failure to timely institute arbitration was not jurisdictional, their failure to timely submit their claim to arbitration during the abatement ordered for that purpose should have resulted in the dismissal of their claims arising out of the label on the seed package. *Cf. Hines v. Hash,* 843 S.W.2d 464, 469 (Tex.1992) (A trial court should dismiss a plaintiff's DTPA suit if it fails to give the notice required by the DTPA "while the action is abated for that purpose.... *See Miller v. Kossey,* 802 S.W.2d 873, 876-77 (Tex. App.—Amarillo 1991, writ denied) (no no-

tice for more than six months after abatement granted until date set for trial).").

### DTPA—MISREPRESENTATION APART FROM LABEL OR WARRANTY

Apart from the information printed on the labels on the seed packages, the Wilkins allege only one misrepresentation. According to the Wilkins, Helena representative Elmore told them that Cherokee was a "good" seed. However, this alleged misrepresentation amounts to no more than non-actionable puffing. *Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 163 (Tex.1995) (holding statements that a "building was 'superb', 'super fine', and 'one of the finest little properties in the City of Austin'" "were not misrepresentation of material fact but merely 'puffing' or opinion"). Nor will this statement support the jury's finding that Helena and Hyperformer committed an unconscionable act or course of action. *See Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex.1998) ("To be actionable under subsection (A), the resulting unfairness must be 'glaringly noticeable, flagrant, complete and unmitigated.'" (quoting *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985))).

Because the Wilkins' claims arising out of alleged misrepresentations apart from the label on the seed package are not actionable, and their claims arising out of the label are barred by their failure to timely institute arbitration, I would reverse the trial court's judgment and render judgment in favor of Helena and Hyperformer. Because the majority fails to do so and instead affirms the trial court's judgment, I must respectfully dissent.

---

1. TEX. AGRIC. CODE ANN. § 64.002(a) (Vernon 1995).