COURT OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-411-CV
 
DANIEL AND BETTY NORSTRUD                                                            
APPELLANTS
V.
TRINITY UNIVERSAL INSURANCE
COMPANY                                                
APPELLEE
------------
FROM THE 362ND DISTRICT
COURT OF DENTON COUNTY
------------
OPINION
------------
I. Introduction
Trinity Universal Insurance Company
("Trinity") denied a claim by its insureds, Daniel and Betty Norstrud
("Norstruds"), for damage to the Norstruds' home when its foundation
moved. The Norstruds sued Trinity for breach of contract, breach of the duty of
good faith and fair dealing, and violations of the Deceptive Trade Practices Act
and insurance code. A jury found that the movement of the foundation of the
Norstruds' home was not caused by an accidental discharge, leakage, or overflow
of water from the sprinkler system. Accordingly, under the terms of the
Norstruds' policy with Trinity, the home's damage was not covered by the Trinity
policy. The trial court entered a take-nothing judgment against the Norstruds
based on the jury's verdict. In two issues on appeal, the Norstruds complain
that the trial court abused its discretion by admitting the opinion testimony of
one of Trinity's experts and that the jury's failure to find that a sprinkler
system leak caused the home's foundation movement is against the great weight
and preponderance of the evidence. We will affirm.
II. Background Facts
The Norstruds hired their friend, Doug
Chaney, to build a house for them in Argyle, Texas. Chaney installed forty-five
piers under the 3,700 square-foot house and four piers under the garage. The
piers were not engineered, that is, they were not included in the architectural
plan for the house or specially engineered for the house. Mr. Norstrud decided
to put the piers in to minimize any shifting or cracking in the foundation.
In January or February of 1998, as the
weather grew colder, Mr. Norstrud closed the gate valve to his sprinkler system
to keep it from freezing. The sprinkler system's main feed line, a one-inch line
buried about a foot underground, is under pressure all the time unless the gate
valve is closed.
In February 1998, the Norstruds received a
water bill showing usage of 82,000 gallons of water for the month of January.
Mr. Norstrud immediately inspected his property for a water leak, but found
none. He checked the water meter, which has a leak detector dial on it, and that
dial was not moving. He called the water company, and they said that they had
noticed the large water usage and sent a meter reader out twice to check the
accuracy of the reading. The water company suggested that Mr. Norstrud just wait
and see what happened the next month.
In March, Mr. Norstrud opened the gate
valve and turned on the sprinkler system to water his yard. All of the sprinkler
circuits worked properly. After the system completed its watering cycle, Mr.
Norstrud walked around the house and discovered a large area of ground with
water bubbling up through "wormholes" to a level one-half inch to one
inch above the ground. He then realized a sprinkler leak existed, located the
leak approximately six feet from the northwest corner of the house, dug in the
area of the leak, and located a fracture in the main feed line. He cut out and
replaced the piece of fractured PVC pipe, and the Norstruds' water usage
returned to normal.
In April 1998, cracks began appearing in
the Norstruds' house. Mr. Norstrud repaired the cracks, but they kept coming
back and getting bigger. He could hear the house popping, creaking, and moving.
Finally, he called Chaney and asked him to come over and look at the house.
Chaney told Mr. Norstrud that it looked like a "classic water leak
problem." Chaney told Mr. Norstrud to "find an engineer [to] take a
look at this."
The Norstruds hired a structural engineer,
Esam Jarwan, who concluded in an October 17, 1998 report that the sprinkler leak
had caused the fine particles of the soil to wash out, resulting in a soil
volume decrease on the west side of the house and causing the foundation to sink
on that side. On October 23, 1998, the Norstruds made a claim for damages under
their homeowner's policy issued by Trinity. Following an investigation and
engineering report, Trinity denied the Norstruds' claim.
III. John Bryant's Expert
Testimony
In their first issue, the Norstruds
contend that the trial court abused its discretion by admitting the testimony of
Trinity's expert, Dr. John Bryant, because his testimony was scientifically
unreliable under the Robinson/Daubert analysis.
(1) A two-part test governs whether expert testimony is admissible:
(1) the expert must be qualified; and (2) the testimony must be relevant and
based on a reliable foundation. Helena Chem. Co. v. Wilkins, 47 S.W.3d
486, 499 (Tex. 2001). Whether the trial court properly admitted expert testimony
is subject to an abuse of discretion standard of review. Id.; Robinson,
923 S.W.2d at 558.
The test for abuse of discretion is
whether the trial court acted without reference to any guiding rules or
principles. Robinson, 923 S.W.2d at 558; Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986). The test is not whether, "in the opinion of the
reviewing court, the facts present an appropriate case for the trial court's
action." Robinson, 932 S.W.2d at 558. A reviewing court cannot
conclude that a trial court abused its discretion if, in the same circumstances,
it would have ruled differently or if the trial court committed a mere error in
judgment. Id. Although the trial court serves as an evidentiary
gatekeeper by screening out irrelevant and unreliable expert evidence, it has
broad discretion to determine the admissibility of that evidence. Exxon
Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex. 2002) (quoting Robinson,
923 S.W.2d at 556). We must uphold the trial court's evidentiary ruling if there
is any legitimate basis for it. Owens-Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 43 (Tex. 1998).
Here, the Norstruds challenge the second
prong of the two-part test for admissibility of expert testimony, i.e., they
contend Bryant's resistivity imaging testing was scientifically unreliable and
that the trial court abused its discretion by admitting Bryant's opinions and
conclusions because they were based on the resistivity imaging testing.
(2)
To gauge reliability, the supreme court
instructs:

 Daubert and Rule 702 demand
 that the district court evaluate the methods, analysis, and principles relied
 upon in reaching the opinion. The court should ensure that the opinion
 comports with applicable professional standards outside the courtroom and that
 it will have a reliable basis in the knowledge and experience of the
 discipline.

Helena Chem. Co., 47 S.W.3d at
499 (quoting Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713,
725-26 (Tex. 1998)). Expert testimony must be relevant under rule 702 of the
rules of evidence and, in addition, the underlying scientific technique or
principle must be reliable. Robinson, 923 S.W.2d at 557.
"Scientific evidence which is not grounded 'in the methods and procedures
of science' is no more than 'subjective belief or unsupported
speculation.'" Id. (quoting Daubert, 509 U.S. at 590, 113
S. Ct. at 2795). Unreliable evidence is of no assistance to the trier of fact
and is therefore inadmissable under rule 702. Id.
Bryant testified that he had recently
patented his resistivity imaging technique. Resistivity testing involves the
premise that electricity flows more rapidly through water than through rocks,
sand, or other ground material. Resistivity imaging testing involves placing
electrodes along the top of the ground, like pins in a pin cushion, running
electricity through the electrodes, and determining the water concentration of
an area of ground by the electrical conductivity of the ground. Bryant's paper
on resistivity imaging testing was accepted for presentation at the
then-upcoming American Society of Civil Engineers national convention.
Bryant explained that the results of the
resistivity imaging testing at the Norstruds' home were part of what he
based his conclusions on. The resistivity testing showed sandy soils on the
north side of the Norstruds' home and clayey soils on the south side that will
react differently to moisture. The resistivity imaging results "further
support" the soil boring samples taken by Bryant at the Norstruds' home.
They are also consistent with a United States Department of Agriculture soil
survey of Denton County showing that the south portion of the Norstruds' home is
situated on Wilson clay loam soil and the north part of their home is on
Callisburg fine sandy loam soil.
Following Trinity's denial of their claim,
the Norstruds hired Hussein Abusaad to conduct geotechnical testing and to
analyze their foundation problem. Abusaad took two soil borings from the corners
of the Norstruds' home. He prepared a report and testified at trial that based
on the testing he conducted at the Norstruds' home, it was more likely that the
water from the sprinkler leak would "go up and run off" and that it
would be less likely to go down below the surface of the ground because of the
type of soil at the location of the leak. Byrant testified that his resistivity
imaging testing results were consistent with Abusaad's boring results.
Additionally, Bryant testified that even
after the Norstruds' sprinkler leak was fixed, damage to the Norstruds' home
continued to occur and progress, especially around the home's fireplace. Bryant
"got up in the attic" and discovered some "framing issues"
that "had allowed the weight of the roof to settle down" and put
pressure on the western and eastern walls of the living room. Bryant explained
that long roof rafters like the Norstruds' should be braced with "rakers"
to support the rafters and keep them from sagging or deflecting over time. Some
supporting rakers were missing in the Norstruds' home, allowing the roof to
place an inordinate amount of weight on the western and eastern living room
walls. That is why, according to Bryant, the damage around the Norstruds'
fireplace continued to get progressively worse, as shown in pictures taken from
1998 through 2001.
Bryant further testified that the straight
shaft piers placed under the Norstruds' home when it was built also contributed
to the foundation's movement. He testified that because the soil on the south
side of the house was more clayey and expansive, moisture could make the
foundation and piers move up so that the piers contributed to the foundation
movement. He said a properly engineered foundation would have utilized belled
piers, not straight piers. Belled piers are wider and heavier at the bottom, so
they should not rise even if the surrounding soil does. He also said that
Jarwan's report showed the piers under the northwest portion of the house were
substantially wider-spaced than the piers under the western portion and opined
that this variable spacing of the piers contributed to the home's diselevation.
The Norstruds objected to Bryant's
testimony: "I'm going to object, your Honor, to any part of his report that
refers to this [resistivity imaging testing] and any part of his conclusion or
testimony that relies or opinions that rely on any part to this unproven,
unique, recently patented, unpublished method of using resistivity imaging to
derive geophysical conclusions." In exercising its gatekeeping function,
the trial court queried Bryant:

     THE COURT: Your
 report that you made in this case, I think I heard you earlier say that it was
 only partially based on this [resistivity imaging testing]? Is that correct?
     THE WITNESS: Yes.
     THE COURT: You used
 other methods and other ways than this to make your report; is that correct.
     THE WITNESS: Yes.
     THE COURT: I'm going
 to deny the challenge.

In reviewing the trial court's decision to
admit Bryant's opinions and conclusions, we look at the substance of Bryant's entire
testimony. State Farm Fire & Cas. Co. v. Rodriguez, 88 S.W.3d
313, 318 (Tex. App.--San Antonio 2002, no pet. h.). The record as a whole shows
that Bryant's resistivity imaging testing and the results of that testing were
simply one tool he utilized in reaching his opinions and conclusions that the
sprinkler leak did not cause the foundation movement. The Norstruds do not
challenge the balance of Bryant's testimony or methodology. Accordingly, the
trial court could have reasonably concluded that Bryant's ultimate opinions were
grounded in unchallenged scientific method and procedure and amounted to more
than subjective belief or unsupported speculation, regardless of the resistivity
imaging testing results. See Helena Chem. Co., 47 S.W.3d at 500-01.
The supreme court in Helena Chemical
Company addressed a challenge to expert testimony very similar to the
Norstruds' challenge here. Helena Chemical Company challenged the plaintiff's
expert, Pleunneke, on the ground that his testimony was unreliable. Id.
The supreme court noted:

 Helena fails to recognize that the issue
 here is whether Cherokee seed is suitable for dryland farming as Helena
 represented. And it [Helena] ignores the numerous bases underlying Pleunneke's
 opinion.

Id. The court noted that
Pleunneke relied upon a number of things in forming his opinion, including a
physical inspection of the Cherokee seed crop, photographs of the field, samples
of the soil, and rainfall statistics. Id. The supreme court pointed out
that "Helena does not argue that this foundational data underlying
Pleunneke's opinion testimony is unreliable." Id. Based on
Pleunneke's testimony concerning the results of several grain trials, why he
found those to be significant, and how they supported his opinions, as well as
Pleunneke's explanation of the other factors contributing to his opinion, and
why they were significant to his conclusions, the supreme court agreed with the
court of appeals that the trial court did not abuse its discretion by admitting
Pleunneke's testimony. Id. at 501.
Here, examining the entire substance of
Bryant's testimony, his opinions and conclusions that the sprinkler leak did not
cause the foundation movement are based on demonstrable fact, i.e., his soil
boring samples from the Norstruds' home, the United States Department of
Agriculture soil survey of Denton County showing that the south portion of the
Norstruds' home is situated on Wilson clay loam soil and the north part of their
home is on Callisburg fine sandy loam soil, the photographs of the Norstruds'
attic showing missing support rakers, Esam Jarwan's report showing the type and
placement of the existing piers under the house, and the soil borings and report
of Abusaad. The Norstruds did not challenge the reliability of these bases for
Bryant's opinions and conclusions, so we cannot conclude that Bryant's opinions
rely solely on assumptions, possibility, speculation, and surmise. See
Helena Chem. Co. v. Wilkins, 18 S.W.3d 744, 752 (Tex. App.--San Antonio
2000), aff'd, 47 S.W.3d 486 (Tex. 2001). We therefore hold that the
trial court did not abuse its discretion in admitting Bryant's expert testimony.
We overrule the Norstruds' first issue.
IV. Factual Sufficiency of
the Evidence
In their second issue, the Norstruds argue
that the jury's failure to find that a sprinkler system leak caused the
foundation of the Norstruds' home to move is against the great weight and
preponderance of the evidence. In reviewing an issue asserting that an answer is
"against the great weight and preponderance" of the evidence, we must
consider and weigh all of the evidence, both the evidence that tends to prove
the existence of a vital fact as well as evidence that tends to disprove its
existence. Ames v. Ames, 776 S.W.2d 154, 158-59 (Tex. 1989), cert.
denied, 494 U.S. 1080 (1990); Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986). So considering the evidence, if a finding is so contrary to the
great weight and preponderance of the evidence as to be manifestly unjust, the
issue should be sustained, regardless of whether there is some evidence to
support it. Watson v. Prewitt, 159 Tex. 305, 320 S.W.2d 815, 816
(1959); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
In connection with their
great-weight-and-preponderance issue, the Norstruds contend that the testimony
of Tommy Tolson, another of Trinity's experts, constitutes no evidence because
his opinions suffer from a number of analytical gaps. The Norstruds, however,
asserted no objection to Tolson's testimony at trial. Consequently, they did not
preserve the contention that Tolson's opinions suffer from analytical gaps. Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex.), cert. denied,
525 U.S. 1017 (1998) ("To preserve a complaint that scientific evidence is
unreliable and thus, no evidence, a party must object to the evidence before
trial or when the evidence is offered."). Absent objections to Tolson's
qualifications or the reliability of his opinions, the proper weight to give his
opinions is for the trier of fact to decide. See Robinson, 923 S.W.2d
at 558; Stuckey Diamonds, Inc. v. Harris County Appraisal Dist., No.
14-00-00766-CV, slip op. at 5, 2002 WL 1608615, at *3 (Tex. App.--Houston [14th
Dist.] July 18, 2002, no pet. h.). We therefore will consider Tolson's testimony
in conducting our sufficiency review of the evidence.
Bryant's testimony and conclusions,
outlined above, support the jury's failure to find that the sprinkler leak
caused the foundation of the Norstruds' home to move. Tolson, a professional
engineer, testified that he visited the Norstruds' home, examined the house,
took some pictures, took some soil samples from the ground between the leak and
the house, had the samples sent off and tested, and prepared a report. Tolson
testified, and his report concluded, that soil moisture increase from a plumbing
leak or other source did not contribute to the settlement of the Norstruds'
foundation. Esam Jarwan, the Norstruds' expert, testified that it was his
opinion based on reasonable engineering probability that a change in soil
moisture caused by the sprinkler leak caused the Norstruds' foundation to move.
The jury is the sole judge of the
witnesses' credibility and the weight to be given their testimony. Leyva v.
Pacheco, 163 Tex. 638, 358 S.W.2d 547, 549 (1962). The jury could have
believed Bryant's and Tolson's testimony, disbelieved Jarwan's testimony, and
concluded that the sprinkler leak did not cause the foundation movement.
Considering all of the evidence, we cannot conclude that the jury's finding that
the sprinkler leak did not cause the Norstruds' foundation to move is so
contrary to the great weight and preponderance of the evidence that it is
manifestly unjust. We overrule the Norstruds' second issue.
V. Conclusion
Having overruled both the Norstruds'
issues, we affirm the trial court's judgment.
 
SUE WALKER
JUSTICE
 
PANEL B: HOLMAN, GARDNER, and WALKER, JJ.
[DELIVERED JANUARY 16, 2003]

1. Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579, 113 S. Ct. 2786 (1993); E.I. du Pont de Nemours and Co. v.
Robinson, 923 S.W.2d 549, 558 (Tex. 1995).
2. Bryant concluded:

 [T]he dis-elevations [suffered by the
 Norstruds' home] are the result of differential movements resulting from: 1)
 Expected Movements exacerbated by variable site soil conditions; 2)
 Construction Variances and Tolerances; 3) Original Design and Construction; 4)
 Structural Framing and 5) Climatic Effects.

He further opined that "within
reasonable engineering certainty based upon reasonable engineering probability
that the sprinkler line leak is not causally related [to] any documented
differential foundation movements and observed distress at this site."