Daniel and Betty NORSTRUD,
Appellants,

v.

TRINITY UNIVERSAL INSURANCE
COMPANY, Appellee.

No. 2–01–411–CV.

Court of Appeals of Texas,
Fort Worth.

Jan. 16, 2003.

Law Office of Charles McGarry and Charles W. McGarry, Dallas, for appellants.

Ekvall & Bryne, L.L.P. and Erik E. Ekvall, Dallas, for appellee.

Panel B: HOLMAN, GARDNER, and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

Trinity Universal Insurance Company ("Trinity") denied a claim by its insureds, Daniel and Betty Norstrud ("Norstruds"), for damage to the Norstruds' home when its foundation moved. The Norstruds sued Trinity for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Deceptive Trade Practices Act and insurance code. A jury found that the movement of the foundation of the Norstruds' home was not caused by an accidental discharge, leakage, or overflow of water from the sprinkler system. Accordingly, under the terms of the Norstruds' policy with Trinity, the home's damage was not covered by the Trinity policy. The trial court entered a take-nothing judgment against the Norstruds based on the jury's verdict. In two issues on appeal, the Norstruds complain that the trial court abused its discretion by admitting the opinion testimony of one of Trinity's experts and that the jury's failure to find that a sprinkler system leak caused the home's foundation movement is against the great weight and preponderance of the evidence. We will affirm.

### II. BACKGROUND FACTS

The Norstruds hired their friend, Doug Chaney, to build a house for them in Argyle, Texas. Chaney installed forty-five piers under the 3,700 square-foot house and four piers under the garage. The piers were not engineered, that is, they were not included in the architectural plan for the house or specially engineered for the house. Mr. Norstrud decided to put the piers in to minimize any shifting or cracking in the foundation.

In January or February of 1998, as the weather grew colder, Mr. Norstrud closed the gate valve to his sprinkler system to keep it from freezing. The sprinkler system's main feed line, a one-inch line buried about a foot underground, is under pressure all the time unless the gate valve is closed.

In February 1998, the Norstruds received a water bill showing usage of 82,000 gallons of water for the month of January. Mr. Norstrud immediately inspected his property for a water leak, but found none. He checked the water meter, which has a leak detector dial on it, and that dial was not moving. He called the water company, and they said that they had noticed the large water usage and sent a meter reader out twice to check the accuracy of the reading. The water company suggested that Mr. Norstrud just wait and see what happened the next month.

In March, Mr. Norstrud opened the gate valve and turned on the sprinkler system to water his yard. All of the sprinkler circuits worked properly. After the system completed its watering cycle, Mr. Norstrud walked around the house and discovered a large area of ground with water bubbling up through "wormholes" to a level one-half inch to one inch above the ground. He then realized a sprinkler leak existed, located the leak approximately six feet from the northwest corner of the house, dug in the area of the leak, and located a fracture in the main feed line. He cut out and replaced the piece of fractured PVC pipe, and the Norstruds' water usage returned to normal.

In April 1998, cracks began appearing in the Norstruds' house. Mr. Norstrud repaired the cracks, but they kept coming back and getting bigger. He could hear the house popping, creaking, and moving. Finally, he called Chaney and asked him to come over and look at the house. Chaney told Mr. Norstrud that it looked like a

"classic water leak problem." Chaney told Mr. Norstrud to "find an engineer [to] take a look at this."

The Norstruds hired a structural engineer, Esam Jarwan, who concluded in an October 17, 1998 report that the sprinkler leak had caused the fine particles of the soil to wash out, resulting in a soil volume decrease on the west side of the house and causing the foundation to sink on that side. On October 23, 1998, the Norstruds made a claim for damages under their homeowner's policy issued by Trinity. Following an investigation and engineering report, Trinity denied the Norstruds' claim.

### III. JOHN BRYANT'S EXPERT TESTIMONY

■ In their first issue, the Norstruds contend that the trial court abused its discretion by admitting the testimony of Trinity's expert, Dr. John Bryant, because his testimony was scientifically unreliable under the *Robinson/Daubert* analysis.[1] A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). Whether the trial court properly admitted expert testimony is subject to an abuse of discretion standard of review. *Id.; Robinson*, 923 S.W.2d at 558.

■ The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles.

*Robinson*, 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The test is not whether, "in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action." *Robinson*, 923 S.W.2d at 558. A reviewing court cannot conclude that a trial court abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment. *Id.* Although the trial court serves as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, it has broad discretion to determine the admissibility of that evidence. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex.2002) (quoting *Robinson*, 923 S.W.2d at 556). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

■ Here, the Norstruds challenge the second prong of the two-part test for admissibility of expert testimony, i.e., they contend Bryant's resistivity imaging testing was scientifically unreliable and that the trial court abused its discretion by admitting Bryant's opinions and conclusions because they were based on the resistivity imaging testing.[2] To gauge reliability, the supreme court instructs:

1. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995).

2. Bryant concluded:
   [T]he dis-elevations [suffered by the Norstruds' home] are the result of differential movements resulting from: 1) Expected Movements exacerbated by variable site soil conditions; 2) Construction Variances and Tolerances; 3) Original Design and Construction; 4) Structural Framing and 5) Climatic Effects.
   He further opined that "within reasonable engineering certainty based upon reasonable engineering probability that the sprinkler line leak is not causally related [to] any documented differential foundation movements and observed distress at this site."

*Daubert* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.

*Helena Chem. Co.,* 47 S.W.3d at 499 (quoting *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 725–26 (Tex.1998)). Expert testimony must be relevant under rule 702 of the rules of evidence and, in addition, the underlying scientific technique or principle must be reliable. *Robinson,* 923 S.W.2d at 557. "Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Id.* (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795). Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissable under rule 702. *Id.*

Bryant testified that he had recently patented his resistivity imaging technique. Resistivity testing involves the premise that electricity flows more rapidly through water than through rocks, sand, or other ground material. Resistivity imaging testing involves placing electrodes along the top of the ground, like pins in a pin cushion, running electricity through the electrodes, and determining the water concentration of an area of ground by the electrical conductivity of the ground. Bryant's paper on resistivity imaging testing was accepted for presentation at the then-upcoming American Society of Civil Engineers national convention.

Bryant explained that the results of the resistivity imaging testing at the Norstruds' home were *part* of what he based his conclusions on. The resistivity testing showed sandy soils on the north side of the Norstruds' home and clayey soils on the south side that will react differently to moisture. The resistivity imaging results "further support" the soil boring samples taken by Bryant at the Norstruds' home. They are also consistent with a United States Department of Agriculture soil survey of Denton County showing that the south portion of the Norstruds' home is situated on Wilson clay loam soil and the north part of their home is on Callisburg fine sandy loam soil.

Following Trinity's denial of their claim, the Norstruds hired Hussein Abusaad to conduct geotechnical testing and to analyze their foundation problem. Abusaad took two soil borings from the corners of the Norstruds' home. He prepared a report and testified at trial that based on the testing he conducted at the Norstruds' home, it was more likely that the water from the sprinkler leak would "go up and run off" and that it would be less likely to go down below the surface of the ground because of the type of soil at the location of the leak. Bryant testified that his resistivity imaging testing results were consistent with Abusaad's boring results.

Additionally, Bryant testified that even after the Norstruds' sprinkler leak was fixed, damage to the Norstruds' home continued to occur and progress, especially around the home's fireplace. Bryant "got up in the attic" and discovered some "framing issues" that "had allowed the weight of the roof to settle down" and put pressure on the western and eastern walls of the living room. Bryant explained that long roof rafters like the Norstruds' should be braced with "rakers" to support the rafters and keep them from sagging or deflecting over time. Some supporting rakers were missing in the Norstruds' home, allowing the roof to place an inordinate amount of weight on the western and eastern living room walls. That is why,

according to Bryant, the damage around the Norstruds' fireplace continued to get progressively worse, as shown in pictures taken from 1998 through 2001.

Bryant further testified that the straight shaft piers placed under the Norstruds' home when it was built also contributed to the foundation's movement. He testified that because the soil on the south side of the house was more clayey and expansive, moisture could make the foundation and piers move up so that the piers contributed to the foundation movement. He said a properly engineered foundation would have utilized belled piers, not straight piers. Belled piers are wider and heavier at the bottom, so they should not rise even if the surrounding soil does. He also said that Jarwan's report showed the piers under the northwest portion of the house were substantially wider-spaced than the piers under the western portion and opined that this variable spacing of the piers contributed to the home's diselevation.

The Norstruds objected to Bryant's testimony: "I'm going to object, your Honor, to any part of his report that refers to this [resistivity imaging testing] and any part of his conclusion or testimony that relies or opinions that rely on any part to this unproven, unique, recently patented, unpublished method of using resistivity imaging to derive geophysical conclusions." In exercising its gatekeeping function, the trial court queried Bryant:

THE COURT: Your report that you made in this case, I think I heard you earlier say that it was only partially based on this [resistivity imaging testing]? Is that correct?

THE WITNESS: Yes.

THE COURT: You used other methods and other ways than this to make your report; is that correct.

THE WITNESS: Yes.

THE COURT: I'm going to deny the challenge.

■ In reviewing the trial court's decision to admit Bryant's opinions and conclusions, we look at the substance of Bryant's *entire* testimony. *State Farm Fire & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 318 (Tex. App.-San Antonio 2002, no pet.). The record as a whole shows that Bryant's resistivity imaging testing and the results of that testing were simply one tool he utilized in reaching his opinions and conclusions that the sprinkler leak did not cause the foundation movement. The Norstruds do not challenge the balance of Bryant's testimony or methodology. Accordingly, the trial court could have reasonably concluded that Bryant's ultimate opinions were grounded in unchallenged scientific method and procedure and amounted to more than subjective belief or unsupported speculation, regardless of the resistivity imaging testing results. *See Helena Chem. Co.*, 47 S.W.3d at 500–01.

The supreme court in *Helena Chemical Company* addressed a challenge to expert testimony very similar to the Norstruds' challenge here. Helena Chemical Company challenged the plaintiff's expert, Pleunneke, on the ground that his testimony was unreliable. *Id.* The supreme court noted:

Helena fails to recognize that the issue here is whether Cherokee seed is suitable for dryland farming as Helena represented. And it [Helena] ignores the numerous bases underlying Pleunneke's opinion.

*Id.* The court noted that Pleunneke relied upon a number of things in forming his opinion, including a physical inspection of the Cherokee seed crop, photographs of the field, samples of the soil, and rainfall statistics. *Id.* The supreme court pointed out that "Helena does not argue that this foundational data underlying Pleunneke's opinion testimony is unreliable." *Id.*

Based on Pleunneke's testimony concerning the results of several grain trials, why he found those to be significant, and how they supported his opinions, as well as Pleunneke's explanation of the other factors contributing to his opinion, and why they were significant to his conclusions, the supreme court agreed with the court of appeals that the trial court did not abuse its discretion by admitting Pleunneke's testimony. *Id.* at 501.

Here, examining the entire substance of Bryant's testimony, his opinions and conclusions that the sprinkler leak did not cause the foundation movement are based on demonstrable fact, i.e., his soil boring samples from the Norstruds' home, the United States Department of Agriculture soil survey of Denton County showing that the south portion of the Norstruds' home is situated on Wilson clay loam soil and the north part of their home is on Callisburg fine sandy loam soil, the photographs of the Norstruds' attic showing missing support rakers, Esam Jarwan's report showing the type and placement of the existing piers under the house, and the soil borings and report of Abusaad. The Norstruds did not challenge the reliability of these bases for Bryant's opinions and conclusions, so we cannot conclude that Bryant's opinions rely solely on assumptions, possibility, speculation, and surmise. *See Helena Chem. Co. v. Wilkins,* 18 S.W.3d 744, 752 (Tex.App.-San Antonio 2000), *aff'd,* 47 S.W.3d 486 (Tex.2001). We therefore hold that the trial court did not abuse its discretion in admitting Bryant's expert testimony. We overrule the Norstruds' first issue.

### IV. FACTUAL SUFFICIENCY OF THE EVIDENCE

■ In their second issue, the Norstruds argue that the jury's failure to find that a sprinkler system leak caused the foundation of the Norstruds' home to move is against the great weight and preponderance of the evidence. In reviewing an issue asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the issue should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ In connection with their great-weight-and-preponderance issue, the Norstruds contend that the testimony of Tommy Tolson, another of Trinity's experts, constitutes no evidence because his opinions suffer from a number of analytical gaps. The Norstruds, however, asserted no objection to Tolson's testimony at trial. Consequently, they did not preserve the contention that Tolson's opinions suffer from analytical gaps. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998) ("To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered."). Absent objections to Tolson's qualifications or the reliability of his opinions, the proper weight to give his opinions is for the trier of fact to decide. *See Robinson,* 923 S.W.2d at 558; *Stuckey Diamonds, Inc. v. Harris County Appraisal Dist.,* 93 S.W.3d 212, 215 (Tex. App.-Houston [14th Dist.] 2002, no pet.). We therefore will consider Tolson's testimony in conducting our sufficiency review of the evidence.

**756**

Bryant's testimony and conclusions, outlined above, support the jury's failure to find that the sprinkler leak caused the foundation of the Norstruds' home to move. Tolson, a professional engineer, testified that he visited the Norstruds' home, examined the house, took some pictures, took some soil samples from the ground between the leak and the house, had the samples sent off and tested, and prepared a report. Tolson testified, and his report concluded, that soil moisture increase from a plumbing leak or other source did not contribute to the settlement of the Norstruds' foundation. Esam Jarwan, the Norstruds' expert, testified that it was his opinion based on reasonable engineering probability that a change in soil moisture caused by the sprinkler leak caused the Norstruds' foundation to move.

The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (1962). The jury could have believed Bryant's and Tolson's testimony, disbelieved Jarwan's testimony, and concluded that the sprinkler leak did not cause the foundation movement. Considering all of the evidence, we cannot conclude that the jury's finding that the sprinkler leak did not cause the Norstruds' foundation to move is so contrary to the great weight and preponderance of the evidence that it is manifestly unjust. We overrule the Norstruds' second issue.

### V. Conclusion

Having overruled both the Norstruds' issues, we affirm the trial court's judgment.