

NUMBER 13-08-00735-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

BALDEV PATEL D/B/A WHARTON INN
AND JAYESH PATEL,                                                    Appellants,

v.

NAUTILUS INSURANCE COMPANY, GAB
ROBINS NORTH AMERICA, INC., APRIL
HANSON, KEN KAUFFMAN, JEFF M. PROCTOR
INSURANCE AGENCY, INC.,                                          Appellees.

On appeal from the 329th District Court
of Wharton County, Texas.

MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Rodriguez and Vela
Memorandum Opinion by Chief Justice Valdez

Appellants, Baldev Patel d/b/a Wharton Inn and Jayesh Patel ("Patels"), filed suit

against appellees, Nautilus Insurance Company ("Nautilus"), GAB Robins North

America, Inc., April Hanson, Ken Kauffman, Jeff M. Proctor, and Jeff M. Proctor Insurance Agency, Inc.,[1] for claims arising from Nautilus's denial of the Patels' insurance claim for property damage to the Wharton Inn ("Inn") arising from a hail storm. Following a jury trial, the trial court rendered judgment on the jury's verdict that the Patels take nothing on their claims. This appeal ensued. The Patels raise two issues concerning the admission of expert testimony and the sufficiency of the evidence supporting the verdict. We affirm.

## I. BACKGROUND

Baldev purchased the Inn in Wharton, Texas, in 1997 and operated the Inn with his son, Jayesh. In February 2003, the Patels purchased a commercial property insurance policy from Nautilus for the Inn through retail insurance agent Jeff M. Proctor and Jeff M. Proctor Insurance Agency, Inc. The policy period ran from February 14, 2003 to February 14, 2004. Reliable Commercial Services inspected the Inn on behalf of Nautilus on March 6, 2003. According to its report, the premises consisted of three buildings: two motel buildings and one office/owner apartment with a carport.[2] The report indicated that the Inn was approximately thirty years old and was built with frame construction and a composition roof. According to the report, the Inn was in "good"

---

[1] Nautilus issued the commercial property insurance policy on the Patels' property; GAB Robins North America, Inc. was the insurance adjusting firm who handled the Patels' claim for Nautilus under the policy; April Hanson was the claims examiner or claims adjuster for Nautilus who supervised the Patels' claim; Ken Kauffman was the independent claims adjuster for GAB Robins North America Inc. who inspected the Patels' property; and Jeff M. Proctor of Jeff M. Proctor Insurance Agency, Inc., was the retail agent who sold the Patels the insurance policy at issue herein. Delta General Agency was the general insurance agent for Nautilus and is not a party to this lawsuit or appeal.

[2] As events unfolded, it became apparent that an error in the underwriting process initially resulted in only one of the buildings being covered by Nautilus's policy. After the Patels made their claim, the error was discovered and, after some delay, eventually corrected.

2

condition, the housekeeping was "good," and the "[f]urniture, fixtures and equipment are in good condition and safely arranged."[3]

On March 13, 2003, one week following this inspection, a severe hail storm damaged the roofs of the buildings at the Inn. The Patels contacted their agent, Jeff Proctor, and reported the damage to the Inn. Appellee, GAB Robins North America, Inc., sent its claims adjuster, Ken Kauffman, to the Inn on April 3, 2003, to inspect the property damage. According to Kauffman's report:

> Insured claiming extensive interior damage to hotel rooms. This damage appears to be long term water damage due to roof leaks not related to this loss. There is also damage to carpeting in numerous rooms where water has flooded in through the front entrance door. Some rooms have extensive mold damage due to long term roof leaks.

> There is no wind damage to the exterior of the structure. Only hail damage to the composition shingles which would not have resulted in immediate roof leaks.

After the Patels made a claim for both roof damage and interior damage under their insurance policy, Nautilus paid for replacing the roofs on the Inn's buildings; however, Nautilus refused to provide coverage for the damage allegedly sustained to the interior of the Inn during the storm. The underlying lawsuit ensued, and the Patels' claims were tried to a jury. The jury found that Nautilus did not fail to comply with the insurance policy with respect to the Patels' claims for interior damage. The trial court entered a take-nothing judgment against the Patels.

## II. EXPERT TESTIMONY

---

[3] Reliable Commercial Services sent this report to the Delta General Agency, who then provided it to Nautilus where the report was placed in the underwriting file for the Inn. As part of the underwriting file, the report was not provided to the insurance adjusters handling the Patels' claim. Testimony at trial established that not every commercial property is inspected prior to being issued an insurance policy and that adjusters typically do not review property inspection reports made during the underwriting stage. Reliable's inspection report does not include photographs of the interior of the Inn.

3

The Patels' first issue on appeal concerns the trial court's admission of expert testimony:

> Nautilus denied the Patels' claim for interior damage based solely on the conclusion of its adjuster, Ken Kauffman, that the interior water damage was the result of long-term roof leaks. At trial, Kauffman admitted that his conclusion was speculative and not based on objective evidence. Despite that admission, the court allowed Kauffman to offer his opinion testimony about roofing materials, roofing construction practices, deterioration around thresholds, and the interpretation of photographs of interior light fixtures. Was it an abuse of discretion to permit Kauffman to bolster his admittedly speculative conclusion by offering his opinion testimony?

As a threshold matter, we note that Nautilus contends that the Patels waived this issue because they (1) elicited the allegedly objectionable testimony from Kauffman; and (2) failed to object, move to strike, request a mistrial, or request any limiting instructions from the trial court. As a general rule, an objection is required to preserve error regarding the admission of evidence, including the admission of expert testimony. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). When a scientific opinion is not conclusory but the basis offered for it is unreliable, a party who objects may complain that the evidence is legally insufficient to support the judgment. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816-817 (Tex. 2009). In this circumstance, an objection is required to give the proponent a fair opportunity to cure any deficit and thus prevent trial by ambush. *See id.* As the Texas Supreme Court has explained:

> [T]here is a distinction between challenges to an expert's scientific methodology and no evidence challenges where, on the face of the record, the evidence lacked probative value. When the expert's underlying methodology is challenged, the court necessarily looks beyond what the expert said to evaluate the reliability of the expert's opinion. When the testimony is challenged as conclusory or speculative and therefore non-probative on its face, however, there is no need to go beyond the face of the record to test its reliability. We therefore conclude

4

that when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. However, when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility.

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (citations omitted). Therefore, unreliable expert testimony requires a timely objection; however, conclusory expert testimony does not. *See id.* The distinction between these two categories of testimony may, in certain circumstances, be subject to dispute. *See City of San Antonio*, 284 S.W.3d at 828-29 (Medina, J., dissenting).

In the instant case, the Patels' assertion is that Kauffman's testimony was speculative, and thus, no objection was required. *See Coastal Transp. Co.*, 136 S.W.3d at 233. Accordingly, we proceed to address the merits of the Patels' issue pertaining to Kauffman's testimony.

A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). Whether the trial court properly admitted expert testimony is subject to an abuse of discretion standard of review. *Id.*; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Robinson*, 923 S.W.2d at 549; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The test is not whether "in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action." *Robinson*, 932 S.W.2d at 558. A reviewing court cannot

5

conclude that a trial court abused its discretion merely because it would have ruled differently. *Id.* The trial court has "broad" discretion to determine the admissibility of expert evidence. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002); *Sanchez*, 997 S.W.2d at 590; *Robinson*, 923 S.W.2d at 558. We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Norstrud v. Trinity Univ. Ins. Co.*, 97 S.W.3d 749, 752 (Tex. App.–Fort Worth 2003, no pet.).

Ken Kauffman, who was a claims supervisor for United Fire Group at the time of trial, testified that he had worked as a claims adjuster for more than twenty-seven years. According to Kauffman, he had twenty-eight years of experience in inspecting roofs, had been trained regarding property inspections generally and roof inspections specifically, and had inspected "thousands" of roofs. He admitted he had always worked for insurers. Kauffman testified that he had nothing personal to gain with regard to whether an insurance claim was accepted or denied; however, he stated that "[i]t would be to my benefit to find more coverage because the larger estimate I write, the more I get paid." Upon cross-examination, Kauffman stated that insurance companies would continue to hire him as an adjuster even if he recommended payment on a large number of claims.

Kauffman was assigned to investigate the Patels' claim on March 31. He visited the Inn on April 3 and spent a couple of hours at the Inn inspecting the damage. He spoke with Jayesh Patel, inspected the roofs of the buildings, took measurements, and took photographs of the interior and exterior of the property. The photographs he took during his inspection were introduced into evidence at trial, and Kauffman explained the contents of the photographs.

Photographs of the north slope of the roof of one of the buildings showed hail damage, which Kauffman indicated by circling the damaged spots, and further showed spots where the shingles lacked granular surfacing material as a result of hail impact. Kauffman testified that the roof was composed of three layers of shingles and that the hail made some indentations into the surface layer of shingles, but did not penetrate into the second or third layer of shingles.

Kauffman testified that the hail damage appeared to be recent because the "underneath mat of the shingle will change, will deteriorate once it's exposed to the sun for any length of time." He further testified that the area on a shingle where granular material is missing is darker or shinier when the damage occurred recently. Kauffman found hail damage throughout different portions of the Inn's roofs. Kauffman believed that the roof vents were not damaged because he did not make any notations regarding damage to them and the Patels did not tell him that they were damaged in the storm.

Kauffman testified that the Inn's roofs showed evidence of previous repairs. He identified previous repairs to the roof by reference to his photographs. The ridge of a roof had other roofing material nailed on top of it. The shingles of an outcrop in a gable were covered with "roll roofing" laid over the shingle roof. Kauffman further identified other areas patched with roofing tar and roll roofing. According to Kauffman, the ridges of a roof and the part of the roof facing the sun ages more rapidly than the remainder of the roof, and he identified aging of the roof ridge at the Inn as indicated by several long marks on the roof as shown in his photographs. He testified that if he had seen holes in the roof or other openings through which water could intrude, he would have taken close-up photographs of them, but he did not see any such apertures at the Inn.

7

Kauffman determined that interior damage to the Inn was not caused by the hail storm. "It was my conclusion that the hail damage was not sufficient enough to cause the roof to leak." Kauffman acknowledged that the Patels told him that all of the interior damage occurred after the hail storm, but Kauffman disagreed. Kauffman testified that the hail storm caused roof damage; however, the damage to the roof was not severe enough to cause the interior leaks. According to Kauffman, the interior damage appeared to be long-standing. Kauffman further testified that in some areas the roof appeared to be leaking, but his conclusion was the leaks were pre-existing and were not caused by the hail storm.

Kauffman testified that he had seen hail claims where water intruded into the interior of a building due to hail damage to the roof; however, such a situation has a "different look to the trained eye" than what he saw at the Inn. In such a case, the "impacts are much larger, much deeper to the point that they can penetrate the roof." He looked for this sort of damage at the Inn but did not find it. The long-term nature of the leaks that he saw seemed obvious: "Because . . . the damage that they were showing me to the interior, there was just no way that it could have occurred, in my opinion, from the hail."

Several of the photographs introduced into evidence and discussed at trial depicted the interior of several of the motel rooms with water stains on the carpet surrounding the entry doors. Kauffman testified that this was "surface" water that was entering into the motel rooms through entry doors. "It appeared to be where the rainwater was coming in off the parking lot area or the sidewalk and running underneath the entrance door causing the carpet to be wet from the inside." Kaufmann testified that

8

the water stains in the carpeting originated at the threshold of the exterior doors to the rooms and then spread to the interior of the rooms. Kauffman testified that one of the rooms had a "half-moon berm . . . asphalt around the entrance door to . . . create a dam for water not to enter." Kauffman testified that he has experience with deterioration at thresholds caused by repeated exposure to water and that such deterioration is common. Kauffman identified and discussed a photograph showing such deterioration at a threshold to one of the rooms. Kaufmann further identified a photograph of a light fixture, which he described as "rusted," and testified that he would not expect to see such deterioration between the time of the hail storm and the time of his inspection.

Kauffman also discussed photographs showing water damage to the ceiling of several of the rooms. Kauffman testified that the water damage to the ceilings was longstanding based on the overall amount of the damage, the size of the water marks, and the variable color of the stains on the ceilings. According to Kauffman, there were multiple "rings" of water damage and rings of different shades, which indicated that the water incursion had "been going on for a long period of time and it's been wetted repeatedly." Kauffman testified that the damage to the ceilings was due to "long-time roof leaks." Kauffman also identified various areas of mold in the rooms.

Kauffman testified that in order for the Patels' claim to be covered under the Nautilus policy, hail or wind would have to create an opening in the structure allowing the entry of water; however, the policy did not cover pre-existing leaks or surface water driven into a room. Kauffman saw no opening in the Inn's roofs that could have been caused by hail that would explain the water damage to the interior of the Inn's buildings. Kauffman testified that if he is uncertain regarding the causation of damage or its

9

susceptibility to repair, he recommends that an expert or engineer provide a second opinion; however, he did not see anything at the Inn that was outside of his expertise or that raised a "borderline" question requiring a second opinion.

On cross examination, counsel for the Patels argued that one of Kauffman's photographs showed holes along the ridge of the roof. Kauffman denied that the photographs depicted holes in the roof. He reiterated his previous testimony that if he had found holes in the structure, he would have taken close-up photographs of the holes. Kauffman instead testified that the photographs indicated areas where granular material was missing from the shingles. The Patels' counsel further cross-examined Kauffman regarding Kauffman's finding that there was no wind damage to the roof, and questioned Kauffman's failure to examine the attic space for water damage. Counsel also attempted to impeach Kauffman by asking if it was true that, in a previous statement, Kauffman testified that the water on the ceiling came from the roof. Kauffman agreed that this statement was true.[4]

Finally, on appeal, the Patels contend that Kauffman admitted his testimony was speculative in the following exchange:

Counsel: It's pure speculation on your part that the damage on the ceiling is long-term roof leaks?

Kauffman: In my opinion, yes.

Counsel: Pure speculation, right?

Kauffman: In my educated inspection, yes.

As an initial matter, we disagree with the Patels' characterization of the above exchange as an "admission" by Kauffman that his testimony was speculative. Rather,

---

[4] Kauffman testified that the roof had previously experienced leaks as evidenced by the roof patches and the long-standing appearance of the interior water stains.

10

Kauffman's affirmative response to counsel's question is premised on counsel's assertion that Kauffman's opinion is that "the damage on the ceiling is long-term roof leaks" and that Kauffman's opinion is based on his "educated inspection." Second, to the extent that the Patels appear to be challenging Kauffman's qualifications to testify regarding roof damage, or the reliability of his testimony, we conclude that any such complaint has been waived because there was no timely objection to Kauffman's qualifications or the reliability of his testimony. The Patels did not preserve this complaint. *See City of San Antonio*, 284 S.W.3d at 817. Third, Kauffman's testimony regarding the alleged damage in this case was based on his training and twenty-eight years of experience. He supported his opinion with ample objective data by referring repeatedly to photographic evidence regarding the physical conditions at the Inn. We conclude that Kauffman's testimony was not speculative, conclusory, or based on unfounded assumptions, and the trial court did not abuse its discretion by allowing this testimony. *See Robinson*, 923 S.W.2d at 549. We overrule the Patels' first issue.

### III. SUFFICIENCY OF THE EVIDENCE

By their second and final issue, the Patels challenge the factual sufficiency of the evidence supporting the jury's conclusion that Nautilus complied with its obligations under the insurance policy. The Patels' second issue reads as follows:

> Question No. 1, asked: "Did Nautilus Insurance Company fail to comply with the insurance policy with respect to the Patels' claim for interior damage?" Nautilus admitted if the interior damage resulted from roof leaks caused by the hail storm, then it would be covered under the policy. Nautilus's sole defense was that the roof leaks were long-term. Apart from Kauffman's improper opinion testimony, Nautilus presented no evidence showing long-term roof leaks. A finding of recent roof leaks caused by the hail storm was supported by the expert testimony of Thomas Gregory, the Patels' testimony, the room rental history, the March 6 inspection report from Nautilus's inspector, Ralph Rader, and

11

Kauffman's own observations about the roof damage. Was the jury's "No" answer to Question No. 1 against the great weight and preponderance of the evidence?

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the case and set aside the verdict and remand the cause for a new trial, if we conclude, viewing the evidence in a neutral light, that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some "evidence of probative force" in support of the verdict. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761-62 (Tex. 2003); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict. *Jackson*, 116 S.W.3d at 761-62. If we determine that the evidence supporting the jury's verdict is not supported by factually sufficient evidence, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

Thomas Newbiggin, a former full-time employee of Nautilus and a current contract employee for Nautilus, testified generally regarding fair claims adjusting, insurance reserves, and how insurance companies make money. Newbiggin discussed a report from Proctor to Nautilus that stated "wind, hail, and rain caused damage to the roof," and that a roofing company told the Patels that the damage was caused by a hail storm causing the roof to leak. Newbiggin acknowledged that the reserve on the Patels' claim was increased from the standard $5,000 per claim to $10,000 per claim based on Kauffman's report. After reviewing Kauffman's report, Newbiggin directed Kauffman to

provide an estimate for the hail damage but not the alleged interior damage. Newbiggin did not investigate the claim further. At the time of the Patels' claim, Newbiggin had only recently begun working for Nautilus and had no personal knowledge regarding Kauffman's expertise, or lack thereof, in adjusting claims.

Newbiggin discussed April Hanson's letter to the Patels denying their claim for interior damage on grounds that the water stains did not line up with exterior damage to the Inn and the interior water stains appeared to have been present before the hail storm. Newbiggin assumed that April's contentions were based both on Kauffman's written report and telephone conferences with Kauffman regarding his inspection.

Newbiggin acknowledged that Nautilus paid $10,948.34 for the Patels' claim on the roof. Nautilus had withheld approximately $2,788 for depreciation, but paid that amount after suit was filed. Nautilus ultimately paid all amounts due for the roof plus a large statutory penalty. Newbiggin testified that Nautilus actually overpaid because of a co-insurance issue whereby the Inn was insured below replacement value.

Newbiggin had extensive experience in adjusting losses from hail storms. In his experience, if he was looking for exterior hail damage that might cause interior water damage, he would look for heavy hits on the roof surface causing fractures to the felt, indentations, deep hits, fractures to the shingle, or, occasionally, penetrations. In reviewing the photographs taken of the Inn, he saw no evidence of fractures or punctures to the shingles. Newbiggin testified that it would have been cheaper for Nautilus to pay the Patels' claim than litigate, but Nautilus did not pay the claim because it did not owe the money.

13

Newbiggin testified that Nautilus "relied on Ken Kauffman's visual inspection and his years of expertise in the field. He gave us a report indicating this was preexisting damages. The photographs substantiate that statement. That's the basis for our denial."

April Hanson, who was employed by Century Surety at the time of trial, provided additional testimony. She worked for Nautilus for nine years and was an adjuster in the claims handling unit when she handled the Patels' claim. Hanson did not specifically recall the Patels' claim. She testified that the Patels' commercial property policy excluded loss to the interior of the buildings caused by rain, whether driven by wind or not, unless the building first sustained damage by a covered cause of loss, which included hail but not rain, to the Inn's roof or walls through which rain entered.

Thomas Keith Gregory, who worked for Rimkus Consulting Group, testified as an expert witness on behalf of the Patels. Gregory testified that he was a forensics expert in damage assessment and estimating and construction management. He did not personally examine the Inn, but only examined photographs of the alleged property damage. He did not see or test any of the materials.

Gregory testified that the ceiling damage did not appear to be the result of long-term leaking because long-term leaking in an interior space, and on sheetrock in particular, causes "several concentric rings of damage." Further, in long-term leaking, the sheetrock disintegrates much more than depicted in the photographs of the Inn, and you begin to see visible mold. According to Gregory, a long-term leak is one existing for a year or more.

Gregory testified that, for example, a photograph showing water stains around an attic vent in the attic did not depict long-term damage because the wood would have been much darker in color if it had been subjected to repeated exposure to water. According to Gregory, none of the water stains appeared to be the result of long-term exposure because, upon repeated exposure to water, wood first turns gray, then turns black. Gregory testified that the leaks at the Inn could have occurred on different occasions, but not long-term. According to Gregory, "some of them show where it may have leaked more than once, but I don't think any of them show where it had leaked over a long period of time."

Gregory opined that, based on the construction, the roof probably dated from the 1950's when the Inn was built. He testified that some of the photographs of stained areas appeared to have resulted from "multiple" exposures. Gregory conceded that Kauffman's photographs showed areas that looked like the roof had been patched and further conceded that people usually patch their roof because it is leaking. Gregory also examined photographs showing dark-colored staining and damage to the rafters that appeared to be the result of "long-term exposure that drips over the edge" of the rafters.

Jayesh Patel testified that his father bought the Inn in 1997. Jayesh lived and worked on the property. Because his father was not fluent in English, Jayesh procured insurance through Proctor, and it was Jayesh's intention to insure all three buildings. He was watching television at the Inn on March 13 when the hail storm hit. He testified that the storm produced golf-ball-sized hail and chunks of ice. It rained heavily before the hail and lightly afterwards, and the storm itself lasted ten to fifteen minutes.

15

Jayesh testified that none of the Inn's rooms had interior water damage prior to the hail storm and that he had never before repaired the rooms because of water leaks. He testified that he checked each of the rooms on a regular, daily basis to determine if they need servicing. He discovered the interior damage to the rooms the day after the hail storm when he went in the rooms and found the ceilings were wet and discolored, the beds and dressers had water on them, and the carpeting was soaked. Twelve rooms were damaged. Jayesh did not inspect the attic space. Jayesh testified that some shingles were blown off the roof around one of the rooms and part of the roof was blown off near another room. He did not recall if the roof vents had been damaged or not.

Jayesh attempted to notify Proctor of the leaks that same day, March 14, but was unable to reach him and left a message. Jayesh left an additional message the following day, Saturday, but did not actually speak to Proctor until the following Monday or Tuesday.

Jayesh testified that it rained approximately four to six times between March 13 and April 3 when Kauffman inspected the property. Jayesh testified that he made efforts during this period of time to prevent further damage: he left the doors open so the carpet would dry and "probably" washed the bedding, wiped up the dressers, and cleaned the bathroom floors. He attempted to put a plastic cover on the roof when it rained during this period because "whenever rain comes, it leaks through," although Jayesh later clarified this statement by saying that he was not speaking of events prior to the hail storm. Jayesh testified that they were unable to rent the rooms during this period of time until they were eventually repaired.

16

Jayesh met Kauffman when he came to inspect the property. Jayesh told Kauffman that the Inn's roofs were damaged, the interior was damaged, and the hotel's sign was damaged. Kauffman spent approximately thirty to thirty-five minutes on the roof and then inspected each of the twelve rooms and the broken sign. Jayesh testified that he had to remind Kauffman to inspect the interior damage and the damage to the motel sign. Jayesh further testified that Kauffman ignored him during the inspection and was unfriendly. Kauffman told Jayesh that there was a question regarding whether all three buildings were covered by the Nautilus policy, and that Kauffman did not believe the interior damage was caused by the hail storm. Jayesh told him that it was.

While Jayesh was attempting to resolve the coverage issue for the multiple buildings at the Inn, and before the Patels' insurance claim for damages had been authorized, Jayesh hired roofers to replace the Inn's roof, which was replaced during the period of April 6 through April 10. Jayesh also hired All Rounder Builders to repair the interiors the motel rooms and paid it $42,920 for the repair work. Jayesh testified that this sum was a reasonable amount to pay in light of other bids, that all of the work was necessary, and it was all related to the hail storm. He further discussed the necessity for and expenses resulting from replacing the televisions, bedding, and carpeting for the twelve damaged rooms. Jayesh reviewed the motel rental history, which showed that the twelve damaged rooms were rented prior to the storm, but were not rented after the storm until August of 2003, when All Rounder Builders finished their repairs to the rooms. Upon cross examination, counsel pointed out that room rental occupancy in 2003 fell from the previous year and that certain rooms were not rented

17

very frequently. Jayesh denied that they were having difficulty renting rooms because of preexisting damage.

Jayesh testified that he did not recall ever having problems with water intruding under the room doors prior to the hail storm, although he conceded that after the carpet was replaced, he did have problems after the storm with water coming under the doors and staining the carpet when "there is a really bad wind blowing." Jayesh was cross examined about additional exterior damages that he had been claiming as a result of the storm, but which he abandoned prior to trial.

Jayesh further testified regarding the roof repairs to the Inn, and specifically regarding the roofing invoice for these repairs. The invoice for the repairs indicated that Pablo Rodriguez performed more than $16,000 in repairs to the roof. Jayesh submitted this invoice to Nautilus for payment. Jayesh admitted that he prepared and completed the invoice himself, but alleged that Rodriguez signed the invoice. Jayesh testified that he was unaware that Rodriguez's tax identification number, as noted on the invoice, was actually the Patels' claim number for the hail claim. Jayesh testified that he did not recall whether he paid Rodriguez by cash or by check and he apparently did not have a receipt establishing his payment to Rodriguez. Although the work was ordered on April 6 and completed on April 10, the invoice was not sent to Nautilus until December 4. Jayesh nevertheless testified that he had incurred the expenses and paid for them and that he did not intend to defraud Nautilus by personally preparing the invoice.

Baldev Patel testified, through an interpreter, that he was out shopping on March 13 when the hail storm hit the Inn, but returned to the Inn immediately when a friend telephoned him. When he arrived, it was no longer hailing but raining heavily. The rain

18

was intermittent, but it lasted at least two hours. Baldev testified that there was no interior damage to the Inn prior to the hail storm. He testified that they discovered the damages to the Inn the day after the storm. Baldev provided further testimony regarding his attempts to repair or mitigate the damage to the Inn. Baldev testified that some of the shingles on the roof were lifted off during the storm and that three attic vents were bent by the storm and were laying on their sides. Baldev stated that he climbed up to the roof and straightened, but did not repair, the vents the day after the storm "so more water would not fall in the room." He hired someone to repair the vents a couple of weeks later and paid that individual a hundred dollars. Baldev did not tell Kauffman about the damaged vents, although he testified that Kauffman spent between two and three hours at the Inn.

Baldev attempted to remove water from the bedspreads by renting something like a vacuum from H.E.B, but further testified that some of the bedspreads were too dirty to wash or have cleaned, so he replaced them.

Baldev thought it rained five or six times between March 13 and April 3 with two or three "big" rains. He tried to put plastic on the roof but the wind kept blowing it away. Baldev denied that water came in under the doors during storms either before or after the hail storm. Baldev testified that the Inn's roof looked like "new" and was in "good shape" when he bought the Inn in 1997, but he also conceded that the various patches on the roof were already there when he purchased the Inn. Baldev did not recall if he paid any of the vendors that did work on the hotel by check, and stated that he paid the carpet invoice of more than $6,000, interior damages of approximately $42,000, and roof repair of more than $16,000 in cash. Like Jayesh, Baldev testified that the interior

19

repairs performed by All Rounder Builders costing $42,920 were necessary and the result of the hail storm.

Ralph Rader, a self-employed insurance inspector, testified that he was retained by Delta General Agency to perform the underwriting inspection at the Inn on March 6, 2003. He testified that the inspection was performed to assess the risk in the underwriting process. When Rader performed the inspection, he was working for Reliable Reports, Inc. Rader testified that his inspection was not detailed or involved and encompassed information gathered by both observation and interviews. The condition of the Inn was remarked as "good," and Rader testified that this observation was based on "anything that would show reasonable maintenance and structural integrity from an observation." He did not go into the attic or do any sort of interior structural observation. With regard to housekeeping at the Inn, Rader walked around the property to measure the building and looked to see if there was "debris accumulation, pulled furniture, [or] trash" around the property. Rader did not specifically recall his inspection of the Inn, but testified that he "typically" only goes into one room and that he "probably" did not go into more than one room based on his charges for the inspection. He utilizes his inspection of one room as a representative sample. Rader testified that he typically does not personally select the room to be inspected, but leaves it to the owner or manager's discretion. Finally, Rader pointed out that the Patels' description of the Inn's gross income was listed at $40,000 annually; however, the receipt history for the Inn indicated a far higher annual income.

We conclude, viewing the evidence in a neutral light, that the verdict is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

*See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761-62. Although the jurors heard testimony from the Patels that the interior of the hotel suffered water damage as a result of the hail storm on March 13, and further heard testimony from the Patels' expert, Gregory, that the water damage was not long-standing, the jurors also heard conflicting evidence. Kauffman testified that although the roof of the Inn was damaged in the hail storm, the hail storm did not cause the roof to leak. He premised his opinion on his physical examination of the roof, which did not reveal apertures, holes, or perforations, and his examination of the water stains in the interior of the Inn. According to Kauffman, the water stains in the carpeting occurred at the thresholds of the rooms and were the result of wind-driven surface water seeping under the doors. The ceiling stains showed varying colored rings of discoloration, thus indicating multiple instances of leaks. Kauffman noted evidence of mold, rust, and wood deterioration in the rooms. The roof of the Inn appeared to be aged and showed signs of deterioration and had previously been patched or repaired, at a minimum of six years earlier, in several locations. Even Gregory conceded that some of the instances of discoloration evidenced "multiple" exposures to moisture and that the rafters showed evidence of "long-term exposure."

"Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *see Golden Eagle Archery, Inc.*, 116 S.W.3d at 761 (stating that the jury remains the sole judge of witnesses' credibility and the weight to be given their testimony); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (holding that the jury can choose to believe one witness over other witnesses or resolve inconsistencies in their testimony).

In the instant case, the jury acted within its province in resolving the foregoing inconsistencies.  The evidence is factually sufficient to support the jury's verdict.  We overrule the Patels' second and final issue.

## IV. CONCLUSION

Having overruled both of the Patels' issues, we affirm the judgment of the trial court.  Pending motions, if any, are dismissed as moot.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
28th day of January, 2011.

22